## MANU THIMATARIGA v. BELINDA C. CHAMBERS ET AL.

[No. 1348, September Term, 1979.]

*Decided July 11, 1980.*

The cause was argued before MORTON, THOMPSON and COUCH, JJ.

*John F. King* and *Frederick G. Savage,* with whom were *Anderson, Coe & King* on the brief, for appellant.

*Marvin Ellin,* with whom were *Donald F. Oakley* and *Ellin & Baker* on the brief, for appellee Belinda C. Chambers. *Edward C. Mackie,* with whom were *Robert W. Fox* and *Rollins, Smalkin, Weston, Richards & Mackie* on the brief, for appellee Edmondson Village Medical Center, Inc.

MORTON, J., delivered the opinion of the Court.

The appellee, Belinda C. Chambers, brought suit in the Baltimore City Court against the appellant, Manu Thimatariga, a medical doctor, and Edmondson Village Medical Center, Inc. (Medical Center), for alleged negligence

in performing a surgical operation upon Ms. Chambers during which Dr. Thimatariga removed her right Fallopian tube, her right ovary and her uterus. During the same operation he removed her left Fallopian tube and her left ovary. No complaint was made as to this phase of the operation.

Count I of the declaration claimed compensatory damages for injuries resulting from the alleged negligence and for failure to obtain Ms. Chambers' informed consent to the removal of those reproductive organs. Count II was a claim for punitive damages. At the conclusion of Ms. Chambers' case, Dr. Thimatariga's motion for a directed verdict in his favor was granted as to Count II and denied as to Count I. The Medical Center's motion for a directed verdict in its favor was granted. The jury returned a verdict in favor of Ms. Chambers in the amount of $1,500,000 which was reduced by the trial judge to $1,200,000.

The record indicates that on December 16, 1975, appellee visited the Medical Center to seek an abortion. At the time she was a twenty-five year old, unmarried mother of two boys. After going through certain routine procedures conducted in the Medical Center, she was introduced to the appellant. After reviewing the history she had given and examining her, he performed the abortion by dilatation and curettage (D&C), a procedure, according to appellant's brief, "that involves suctioning out the contents of the uterus through a vacuum tube." Tissue obtained from the uterus was compatible with the size of a four to six week's fetus, according to Dr. Thimatariga.

On December 26, 1975, the appellee returned to the Medical Center and was examined by the appellant. He was of the opinion that the abdominal pains and cramps she complained of were caused by a cyst upon her left ovary and he scheduled her for an operation on January 6, 1976, to remove the cyst.

On January 3, 1976, according to the appellee, she was suffering severe abdominal pains to an extent that "[i]t hurt to breathe, to talk, to walk. It hurt to do anything." She

endeavored to contact the appellant by telephone and finally reached him about 1 a.m. on January 4, 1976. He advised her to go immediately to the emergency room of the Lutheran Hospital and he agreed to meet her there. The hospital records indicate she was transferred from the emergency room and formally admitted as an in-patient at 3:30 a.m. She was taken to the operating room about 9 a.m. and there the operation was performed by the appellant.

As he proceeded with the operation, according to the appellant, he observed that her left Fallopian tube had ruptured as a result of a tubal pregnancy and her left ovary had a large cyst. He removed both the left tube and the left ovary. Appellant further testified that in his opinion the condition of the right tube and the right ovary was such that the appellee would never be able to conceive a child and he decided it would be good surgical practice to remove them at that time. He thereupon removed the right tube, the right ovary and the uterus.

The appellee testified that after the operation she was "awakened in the recovery room by Dr. Manu [Thimatariga]. He woke me up and asked me how I felt, and then he told me he had given me a complete hysterectomy." She then went on to state: "I thought I was having a nightmare. I was shocked. I said, 'why,' and then I went back to sleep. I just couldn't believe it was happening." She further testified that "he told me that I had had a pregnancy in one tube and the other tube was badly infected, and then he told me that I shouldn't discuss this type of operation because most people don't understand it." When the appellee was asked: "[D]id you ever at any time before this operation was performed, either verbally or in writing, ever authorize Dr. Thimatariga to remove your reproductive organs?," she replied: "No, I didn't. I never saw Mr. Manu before the operation. The only time I was made aware of it was after it was over."

On the other hand, the appellant testified that when he got to the hospital he immediately went to see the appellee and discussed with her the necessity for surgery and the possible need to remove all her reproductive organs. The

appellee conceded that she signed some forms before the operation, but stated that "the forms that I did sign didn't have anything on it, like you showed me at the top, they just had words in the middle. I was in so much pain on January 4th Mr. Savage [appellant's counsel], I would have probably signed anything."

Testifying on behalf of the appellee, Dr. Marshall Klavan, an obstetrician and gynecologist, and Dr. John W. Combs, a pathologist, were of the opinion that appellant acted negligently in failing to have certain tests made in the course of his examination of the appellee on December 26, 1975. They testified that had the tests been made the results would have apprised the appellant that the abortion procedure he performed on that date could not have been successful. The tests would have indicated that the fetus was in appellee's Fallopian tube rather than in her uterus.

They testified further that the right Fallopian tube, the right ovary and the uterus were normal based upon their review of the pathology results. They asserted that had the right tube, the right ovary and the uterus not been removed, the appellee would have been able to bear more children. They pointed out that the loss of estrogen from her ovaries would cause the appellee to undergo physical changes, although the use of Premarin would minimize such changes. They did say that the use of Premarin increased the risk of breast cancer, gall bladder diseases and caused thickening of the blood.

On behalf of the appellant, Dr. James Donald Woodruff, the author of a textbook on gynecologic pathology, testified that because of the condition of the right tube and right ovary, which he observed during his examination of the pathology slides, the appellant had acted in accordance with accepted medical standards when he removed the right tube, the right ovary and the uterus.

Dr. Firooz Beheshti testified on behalf of the appellant and said he was the pathologist at Lutheran Hospital who examined the tissues of the appellee after the operation on January 4, 1976. In his original report, he found that the

appellee's right tube and right ovary, which had just been surgically removed by the appellant, were normal. In March of 1978, which was after suit had been filed by the appellee, he was asked by appellant to review his original findings. Dr. Beheshti testified that after reviewing his original report he discovered he was in error in finding that the appellee's right tube and right ovary were normal. In fact, he stated, his subsequent findings indicated evidence of chronic pelvic inflammation of the right tube and right ovary.

Dr. Frank Baker, called by the defense, testified that it was not normal practice to conduct the tests which appellee's expert witnesses said should have been performed at the time of her examination by the appellant on December 26, 1975. Based on the hospital records, the Medical Center records and appellant's records, as well as the testimony of Dr. Beheshti, he was of the opinion that the removal of the right tube and the right ovary and the uterus was within the acceptable standards of medical care.

In his brief the appellant raises eight issues which we shall address in the order they were presented.

## I.

It is first contended that the comments of appellee's counsel in his opening statement were so prejudicial that it was error to deny appellant's motion for a mistrial.

It appears that in the course of his opening statement, counsel for appellee advised the jury that since the suit against appellant had been filed, "there has been an effort to cover up facts"; that counsel for appellant had gotten expert medical witnesses to persuade the hospital to send them the pathology slides of the appellee, although the appellee never gave her consent to their transmission to the experts; and that such conduct was contrary to Maryland law. Appellant's counsel then objected and all counsel approached the bench where appellant's counsel asked for a mistrial on the ground that he had been accused in front of the jury of committing a crime. After considerable discussion the trial judge announced that he did not think "that a

mistrial is warranted at this time. Should this type of statement continue, it may become necessary to grant a mistrial, but at this point I don't think there is ample prejudice or misconduct to warrant it."

While we think that the course of conduct followed by counsel for appellee in this regard approached the borders of unfairness and prejudicial misconduct, we are not prepared to say that the trial judge, who had the feel of the courtroom atmosphere at the time, abused his judicial discretion in denying appellant's motion for a mistrial. *See Bailey v. Wray,* 230 Md. 359, 362-63 (1963).

Prior to the giving of the opening statements, the trial judge had advised the jury:

> "What the lawyers say in their opening statements and what they say in their closing arguments and what they say in making objections or in making motions are not evidence. The evidence consists of the testimony of the witnesses, any exhibits which may be placed into evidence for your viewing, and any facts which may be stipulated to or agreed upon by both sides."

At the conclusion of the opening statements by both counsel, the trial judge again admonished the jury:

> "Let me again remind you that the opening statements of the lawyers do not constitute evidence. At this point you have been told by each attorney what he contends that the evidence will reveal, but you have heard no evidence, so at this time your minds should be completely open and you should decide the case strictly on the evidence that is about to be presented."

Moreover, when counsel for appellee resumed his opening statement, after the appellant's request for a mistrial had been denied, he advised the jury:

> "I want to say at this point that my reference to Mr. Savage [counsel for appellant] hiring experts and my reference to the fact that records were

released by Dr. Beheshti in no way was meant to indicate that Mr. Savage had committed a crime, or that Mr. Savage has done anything wrong. Mr. Savage is an honorable gentleman doing his job for his client. My reference to the violation of this woman's rights had to do with the fact that Dr. Beheshti, who will be summoned here, had no right to release those records to Dr. Woodruff in 1979 without her permission, and that is what I meant, and if there is any other meaning then I apologize to you and to Mr. Savage."

We think the advisory instructions of the court and the apology extended by counsel for appellee effectively eliminated any prejudice which might have been generated by appellee's counsel's remarks. Certainly, we cannot find that the denial of appellant's motion for a mistrial at that point entitles him to a reversal of the judgment entered against him.

## II.

It is next contended that the trial judge "erred by allowing the Plaintiff [appellee] to attack Dr. Donald Woodruff's integrity in closing argument."

During cross examination of Dr. Woodruff, the following colloquy occurred:

"Q. [Counsel for appellee] Why don't you take a look at the nurse's notes and familiarize yourself with what the condition [of appellee] really was, Doctor.

A. [Dr. Woodruff] Basically, I don't believe notes that are written. Sorry about that.

Q. You don't believe notes that are written?

A. That's correct.

. . . .

Q. He said he doesn't believe notes that are written. Does that go for the pathology report of

January 6th, which says that everything was normal on the right; you don't believe that either, do you?

A. That's correct.

Q. But you do believe the later one, don't you?

A. I believe the one that I wrote.

Q. The one you wrote, and you wrote the later one, and gave it to Dr. Beheshti didn't you?

A. I really don't know. He just asked me for a consultation and I wrote him what my opinion was."

The first pathology report, to which appellee's counsel referred, was dated January 6, 1976. The second report was dated March 16, 1978. On redirect examination Dr. Woodruff testified that he had been initially consulted by appellee just four weeks before the trial, which would have been in early May, 1979.

Immediately prior to closing arguments appellant's counsel filed a motion *in limine* to prevent appellee's counsel from making any comment to the jury about covering up hospital records. The trial judge denied the motion and in the course of his closing argument, counsel for appellee made the following remarks:

"[Mr. Ellin]. You have a very important exhibit in this case, one that I think to use the word which you are going to have to consider, and which I suggest to you merits what I am about to say. You all have that hospital chart there and I won't trouble you to look at it, or point out the page number. The pathology report of January 6, '76 is page 31 and 32. — and I mean on page 32 one doesn't have to be a pathologist or a physician to read the phrases here, microscopic diagnosis: The appendix normal, ovary salpinx right, normal. Normal. Salpinx being the medical word for tube. The right tube, normal. Woodruff at least agreed that the ovary and uterus was normal, but then

since he stated he wrote the second report and Dr. Beheshti accommodated him and filed that amendment.

(Mr. Savage). Objection.

(Mr. Ellin). Two years after the fact —

(The Court). Just a minute.

(Mr. Savage). I don't think Dr. Woodruff — he wrote the second report that Dr. Beheshti prepared.

(Mr. Ellin). I just read the testimony where the doctor said I wrote it, and that is why he believes it.

(The Court). The jury has been instructed and is still instructed that it is to use its own recollection as to what the testimony was if there is a conflict.

(Mr. Ellin). Members of the jury, I just read Dr. Woodruff's testimony to you on page 61 and 62. But you do believe the later one, don't you? The later one being the pathology report of April, 1978, and his answer was: I believe the one that I wrote. Now, what else did he mean other than that? What else did he write? Then we come along March 16, 1978. We suddenly find that the right tube has a fibrous tube ovarian adhesion and fusion of the tubal folds consistent with chronic salpingo oophritis. Beheshti takes the stand and says all of these things were obvious; obvious. Well, if they were obvious in 1978 why in the world weren't they obvious in 1976? And this nonsense he was used to dealing with fresh tissue after completing a four year residency at University of Maryland simply doesn't merit belief. On page 60 of his testimony Dr. Beheshti said: Now, if you look at it, talking about the right Fallopian tube, it is very, very, very — three very's obvious that this Fallopian tube has a very thick wall. Something that is very, very, very obvious in '78 should have at least been quite obvious if not very, very, very in 1976. I urge you to view that change in 1978 as a monumental attempted coverup of facts, and I would urge you —

(Mr. Savage). Objection.

(The Court). Overruled.

(Mr. Ellin). I would urge you not to give any more weight to that addendum than it deserves, and it deserves nothing. Those hospital records were intact right up until this suit was filed, and then some two years later there is a very convenient change. Can we say that this man didn't know about the first report? Heck no. We can't say that. Dr. Beheshti testified that he sent a copy of the January 6, '76 report to Dr. Thimatariga."

Appellant contends that these remarks were improper and should have been disallowed for two reasons. First, he says there is no evidence to support the contention that anyone other than Dr. Beheshti wrote the second pathology report. Second, appellee did not contradict Dr. Woodruff's testimony that he was not called into the case until four weeks before the trial.

The Court of Appeals has held that counsel has "great latitude in presentation of closing argument and any restriction on his remarks is within the trial court's sound discretion." *Dorsey Bros., Inc. v. Anderson*, 264 Md. 446, 454 (1972). Although it is true, in the instant case, that the date of Dr. Woodruff's entry into the case was not contradicted, it is not true that there was no conflicting evidence on the authorship of the second pathology report. The testimony of Dr. Woodruff, set out above, raised a reasonable inference that he did have a hand in writing that report. This raised a legitimate question of fact for the jury to decide and we cannot say it was an abuse of the trial judge's discretion to allow appellant's counsel to make an argument based upon that question.

## III.

Appellant contends that the trial judge erred in allowing counsel for the appellee to change his peremptory strikes after all counsel had submitted their strikes to the court and

the jury was being impanelled. He argues that this constituted an abuse of the court's discretion.

It appears that after an extensive voir dire of the members of the proposed jury, which was to be selected from two jury lists, the trial judge permitted counsel for each of the parties in the case to exercise five peremptory strikes.[1] Counsel made their strikes on the two jury sheets which they had before them. According to counsel for the appellee, "[a]fter juror no. 2 was called and took his place in the jury box, Plaintiff's counsel rechecked the sheet and noticed the fact that it was a juror he intended to strike. Plaintiff's counsel asked to approach the bench and requested that it was necessary to substitute one of his strikes removing a strike so that that could be utilized to remove proposed juror no. 2. It was pointed out to the trial judge that juror no. 2 was employed by the Baltimore Gas & Electric Company, that Plaintiff's counsel had a number of cases pending against this company, and feared any possible prejudice should this juror know of Plaintiff's counsel's involvement against his employer. It was later pointed out to the Court that while the jury was on recess and milling around the Courtroom door that Plaintiff's counsel had come through the door almost knocking this proposed juror off balance because of his proximity to the door."

Over strenuous objection by counsel for appellant, the trial judge authorized the withdrawal of a strike previously exercised against another juror and permitted the appellee's attorney to strike juror no. 2. In the course of making his ruling the trial judge said:

"Of course, each attorney has the right, an absolute right to strike a specific number, in this

---

1. Maryland Rule 543, § a 4 provides: "Whenever it appears that the trial of an action by a jury involves two or more plaintiffs or two or more defendants having adverse or hostile interests ... the court may allow additional peremptory strikes, from additional lists of jurors to be prepared by the clerk, *but no party shall be allowed more than four such strikes.*" (Emphasis supplied.) The issue of five strikes being allowed each counsel has not been raised. Maryland Rule 1085.

case five. It seems to me the real question is whether or not Mr. Ellin — inasmuch as he did have a right to strike Mr. Waltrop in the beginning when he failed to do so, the question is whether or not it was truly inadvertent on his part, or whether it was an after-thought. And I think the second question is whether or not then in evaluating this change would be prejudicial in any way to either side.

. . . .

Gentlemen, the ruling is that, as I previously indicated, I think that it is a bona fide mistake on the part of — an oversight on the part of Mr. Ellin. I think that the Court does have — I think it is proper for the Court to exercise discretion in permitting him to utilize the strike insofar as this juror is concerned, and I believe it was a bona fide mistake. So, I will permit this juror to be removed and Alternate No. 1 would replace him. Alternate No. 2 would then become Alternate No. 1, and we will pick a new Alternate No. 2."

In *Bluthenthal & Bickart vs. May Co.,* 127 Md. 277 (1915), the Court of Appeals was confronted with the identical issue. There the trial judge permitted counsel for the plaintiff, over the objection of the defendant, to withdraw one of his strikes and to exercise that strike to exclude the individual who had been selected as the foreman of the jury which had been impanelled but had not yet been sworn. The Court of Appeals, in approving the action of the trial judge, said, at 285-86:

"It does not appear that the defendant was injured by the action complained of or that the jury which actually tried the case was not composed of competent and qualified jurors. The authorities support the proposition that it is not reversible error for the Court of its own motion to exclude a juror, even for insufficient cause, if an unobjectionable jury is afterwards obtained. . . . This question is examined and authorities collected

in 12 Ency. Pl. & Prac. 381-384, where it is said: 'In the absence of any showing to the contrary, it will be presumed that in excusing a juror the Court acted on correct principles, and that the excuse was sufficient to warrant its action. In any event, the exercise of its discretion will not be revised unless it is clearly apparent that it has been abused. * * * That the Court may exercise its discretion in this respect after acceptance of a juror, before completion of the panel, or before the person selected has been sworn and charged with the case, is generally conceded.' What the Court did was done in the exercise of its discretionary power, and as there was no abuse of its discretion resulting in injury to the defendant its action does not constitute a cause for reversal."

Although *May Co., supra,* is a case of fairly early vintage, we think it represents the law of this State today. *See Johnson v. State,* 18 Md. App. 571, 573-74 (1973). In the case at bar the trial judge carefully articulated his reasons for permitting counsel for the appellee to pursue the course he desired to take with respect to the unacceptable juror. There is not an iota of evidence that the jury which actually tried the case was not composed of competent and qualified jurors. We see no abuse of the trial judge's discretion.

## IV.

It is next contended that the trial court erred in failing to give the jury instructions on the doctrine of informed consent as requested by appellant.

Appellant's requested instructions were numbered 38 and 39 and read as follows:

"38. If you find that a reasonable person in the patient's position would have given consent to the surgery, had she been informed that her right tube was completely closed at one end so that there was no chance that she could have any children, and

there was a risk of immediate post operative complications and long term problems such as pain and recurring inflammation of the pelvic organs, and the risk of possible cancer of the ovaries, and of the cervix and uterus, had the organs been left in, if you find that a reasonable person in the patient's position would have given their consent to such a procedure to remove the right tube, ovary and uterus, then you must return a verdict in favor of the defendant with regard to consent.

39. If you find that a reasonable person in the patient's position would have given consent to surgery, had she been informed of the condition of the tubes as indicated by Dr. Manu, and material risks described to her, then you must find in favor of the defendant with regard to the matter of consent."

The trial court rejected the appellant's request and gave the following instructions on informed consent:

"If you find from the evidence in this case that the injuries and damages of which the plaintiff complains resulted through either a violation of the standard of gynecological and/or hospital care on the part of the defendant, or that such procedure was performed unnecessarily without the informed consent of the plaintiff, then in such case your verdict should be for the plaintiff.

I mentioned the term 'informed consent' which simply means that in a non-emergency situation a doctor is under a duty to explain the surgery to the patient, and to warn the patient of any material risks or dangers inherent in the procedure so as to enable the patient to make an intelligent and informed choice as to whether or not to undergo such surgery. A material risk is one which a physician knows or ought to know would be significant to a reasonable person in the patient's position, in deciding whether or not to submit to the particular surgical procedure.

If you find that there was no emergency need to remove the plaintiff's right ovary, tube and uterus, and if you find that the defendant did not inform the plaintiff of the material risks and complications associated with such surgery, and further if you find that a reasonable person would not have permitted removal of their reproductive organs had they known of those consequences, then your verdict must be for the plaintiff. On the contrary, if you should find that the plaintiff was informed of the surgical procedure and the nature of the operation, and that the plaintiff did, in fact, consent to the operation and consent as indicated by the consent form in evidence to Dr. Thimatariga's use of his discretion in the manner indicated in that consent form, if you find that this consent was actually given by the plaintiff, and that the surgical procedure was in accordance with that consent, then your verdict would be for the defendant."

And at the close of the instructions the trial court stated:

"If you find that the plaintiff did indicate or gave her consent for Dr. Thimatariga to exercise his discretion as to what was necessary to remove, then you must find in favor of the defendant with regard to the question of consent."

When the jury charge was completed, counsel for the appellant made the following exceptions:

"(Mr. Savage) And your Honor, do you have 38 and 39?

(The Court) Yes.

(Mr. Savage) I would also except to the failure to give instruction 38, which deals with the matter of consent, and I think that is a proper instruction based on the testimony of Dr. Thimatariga, and 39, I will except, which also deals with something you may have given similar to that. I am not sure.

(The Court) I think I did. I am quite sure I did.

(Mr. Savage) Those would be the extent of my exceptions, Your Honor."

*Sard v. Hardy,* 281 Md. 432 (1977), announced the controlling rule of informed consent:

"The rule is that a plaintiff cannot recover under the doctrine unless he can prove by a preponderance of the evidence that he would not have given his consent to the proposed procedure had full and adequate disclosure been made at the time consent was originally given. *Karp v. Cooley,* 493 F.2d 408, 422 (5th Cir.), *cert. denied,* 419 U.S. 845 (1974); *Aiken v. Clary,* 396 S.W.2d at 676; *Wilkinson v. Vesey,* 295 A.2d at 690." 281 Md. 448-49.

This requirement

"is to be resolved by an objective test: whether a reasonable person in the patient's position would have withheld consent to the surgery or therapy had all material risks been disclosed. If disclosure of all material risks would not have changed the decision of a reasonable person in the position of the patient, there is no causal connection between nondisclosure and his damage." 281 Md. 450.

Maryland Rule 554 b. 1 states that the trial court "need not grant any requested instruction if the matter is fairly covered by instructions actually given . . . ."

Rule 554 d. requires a high degree of specificity in objections to jury instructions:

"If a party has an objection to any portion of any instruction given, or to any omission therefrom, or the failure to give any instruction, he shall before the jury retires to consider its verdict make such objection stating distinctly the portion, or omission, or failure to instruct to which he objects and the ground of his objection. Opportunity shall be given to make the objection in open court out of the

hearing of the jury upon application either orally or in writing, made before or after the conclusion of the charge."

And Rule 554 e. strictly limits appellate intervention in jury instructions:

"Upon appeal a party in assigning error in the instructions, shall be restricted to (1) the particular portion of the instructions given or the particular omission therefrom or the particular failure to instruct distinctly objected to before the jury retired and (2) the grounds of objection distinctly stated at the time, and no other errors or assignments of error in the instructions shall be considered by the appellate court."

Appellant objected only to the court's failure to give his requested instructions, not to the instructions that were actually given. The issue therefore is whether the actual instructions "fairly covered" the matter of informed consent.

The gist of both the requested instructions is: "If you find that a reasonable person would have given consent to the surgery had she been informed [of the material risks] then you must return a verdict in favor of the defendant."

The gist of the actual instructions is merely the converse: "[I]f, you find that a reasonable person would not have [consented] had they (sic) known of [the material risks] then your verdict must be for plaintiff." Both of these versions accurately state the law of informed consent, of that there can be no dispute.

The problem is that the trial court added a comment:

"On the contrary, if you should find that the plaintiff was informed ... and ... did, in fact, consent ... then your verdict would be for defendant."

Appellant argues that a necessary implication of this statement is that if the jury did not find actual consent they had to find in favor of plaintiff. We do not agree for two

reasons. First, standing alone, the statement is not only true, it was favorable to the defendant. If appellee had been informed and had consented, the jury would have been required to return a verdict for appellant. And this was a relevant issue because there was evidence that she had signed consent forms.

Second, we are required to consider the statement in the context of the whole charge. *Schwier v. Gray,* 277 Md. 631, 637 (1976); *Rafferty v. Weimer,* 36 Md. App. 98, 110 (1977). The trial judge first stated the correct rule of *Sard v. Hardy, supra,* on informed consent, then he added the disputed comment. It is apparent that the purpose of the comment was to clarify the effect of the informed consent rule on the evidence of the signed consent forms. Since the comment immediately followed a correct statement of the rule, we do not believe that it is likely that the jury inferred from it an incorrect version of the rule. In any event, the appellant did not take specific exception to this particular comment of the trial judge. Had he done so the comment could have been clarified.

Thus, the trial court did not err by refusing to give the requested instructions because the matter of informed consent was fairly covered by the instructions that were actually given.

## V.

It is contended that the trial judge committed reversible error in allowing the appellee to repeat crucial elements of her case in rebuttal. Specifically, it is argued that "Dr. John Combs was allowed to testify in rebuttal (1) that the pathology slides did not show any evidence of chronic pelvic inflammatory disease and (2) that the plaintiff would have been able to have more children had her right tube, right ovary and uterus been left in. This was the same testimony offered in plaintiff's case in chief by Dr. Klavan and Dr. Combs. In addition, Belinda Chambers was allowed to repeat her initial testimony that she had had no

conversation with Dr. Thimatariga at the hospital prior to surgery."

In *Riffey v. Tonder,* 36 Md. App. 633, 645-46 (1977), Judge Moore enunciated for this Court the basic definition of rebuttal testimony and the rules governing its admission:

> "Basically, rebuttal evidence is any competent evidence which explains, is a direct reply to or a contradiction of material evidence introduced by an accused in a criminal case or by a party in a civil action. *State v. Hepple,* 279 Md. 265, 270, 368 A.2d 445 (1977), *aff'g, Hepple v. State,* 31 Md. App. 525, 358 A.2d 283 (1976); *Mayson v. State,* 238 Md. 283, 289, 208 A.2d 599, 602 (1965); *Lane v. State,* 226 Md. 81, 90, 172 A.2d 400, 404 (1961), *cert. denied,* 368 U.S. 993 (1962); 6 Wigmore on Evidence § 1873 (Chadbourn rev. 1976).
>
> It is also well settled that whether evidence is properly rebuttal is a matter for the exercise of judicial discretion. In Maryland, an appellate court will not reverse for error in this determination unless the ruling of the trial court was both 'manifestly wrong' and 'substantially injurious.' *Hepple v. State, supra,* 31 Md. App. at 532, 358 A.2d at 288."

Here a review of the evidence indicates that Dr. Combs, appellee's expert witness, was asked in the course of his rebuttal testimony:

> "Would you tell us based on reasonable medical probability whether the right ovary, the right tube, and the right uterus, if left intact, was reasonably anticipated and probable of producing a pregnancy?
>
> MR. SAVAGE: Objection, Your Honor.
>
> THE COURT: Overruled."

Counsel for the parties then approached the bench and an extended argument was presented by both counsel after which the trial judge announced: "I think this specific

question, I think I would sustain the objection." As a result, Dr. Combs never answered the question. Thus, the record simply does not support the appellant's assertion that Dr. Combs was allowed to testify in rebuttal that the appellee would have been able to have more children but for the removal of her right tube, right ovary and her uterus.

It is clear from the record that Dr. Combs in his testimony during the presentation of the appellee's case was confined to an analysis of the pathology slides from which he concluded that there was no evidence that the appellee suffered from a chronic pelvic inflammatory disease. On the other hand, Dr. Woodruff, the appellant's expert, testified during the presentation of appellant's case that enlarged photographs of the slides, which had been introduced by the appellant and which were before the jury at the time of Dr. Woodruff's testimony, demonstrated that the appellee had a chronic pelvic inflammatory disease. These photographs were not before the jury at the time of Dr. Combs' original testimony and it is apparent that the major thrust of his rebuttal testimony was to contradict Dr. Woodruff's interpretation of the photographs. The substance of his rebuttal testimony in this regard is contained in his response to a question: "I see no evidence in those photographs that would support any diagnosis of chronic pelvic inflammatory disease . . . ." While Dr. Combs may have referred in his rebuttal testimony to the pathology slides he had testified to previously, it appears to have been solely for the purpose of rebutting Dr. Woodruff's analysis of the photographs used by him in the course of his testimony on behalf of the appellant.

It is clear from the record before us that the trial judge did not cavalierly permit Dr. Combs' rebuttal testimony but carefully weighed every objection appellant interposed to such testimony. Whether Dr. Combs' testimony was proper rebuttal testimony was a matter within the sound discretion of the trial judge. *Riffey v. Tonder, supra.* Certainly the admission of his testimony was not, in our opinion, both manifestly wrong and substantially injurious. We see no abuse of judicial discretion.

The same may be said of the charge that the appellee was

allowed to repeat her initial testimony that she had had no conversation with appellant at the hospital prior to surgery. The appellant had testified at length concerning a conversation he had with appellee prior to the operation during which he said he explained the consequences of the surgical procedures he might follow in the course of the operation. In the course of her original testimony the appellee stated that she had not even seen the appellant just prior to the operation. In her rebuttal testimony when asked if appellant had a conversation with her just prior to the operation, she was permitted to respond: "No, it never took place." The admission of this five word sentence, even if assumed to be error, was not so substantially injurious to the rights of the appellant as to require a reversal of the judgment entered on the jury's verdict.

## VI.

We see no merit in the appellant's contention that the trial judge "erred by allowing the plaintiff to introduce a portion of the hospital record without allowing the defendant to offer an additional relevant portion at the same time." It appears that the appellee was permitted to introduce all the records of the Lutheran Hospital relating to her condition while a patient, except the March 16, 1978, pathology report. This report indicated that after another examination of the pathology slides by Dr. Beheshti, he concluded that appellee's right tube and right ovary were chronically diseased. As we have already noted, in an earlier report Dr. Beheshti had found them to be normal.

Although the appellant was permitted to introduce the March 16, 1978, report as a part of his case, he asserts that he should have been permitted to introduce it at the time the appellee put in the other hospital records. Otherwise, he contends, "a distorted impression may linger and work its influence on the jury at the subconscious level."

It is, of course, well settled that "[t]he overall conduct of a trial is subject to the sound direction of the trial judge. This Court will not interfere with that direction unless there is a

clear abuse of the trial judge's discretion in this regard which results in prejudice to the accused." *Turner v. State,* 7 Md. App. 74, 78 (1969).

We are not convinced that the action of the trial judge in requiring appellant to await the presentation of his case before permitting the introduction of the March 16, 1978, report created such a distorted impression of the hospital records that the impression may have lingered and worked its influence on the jury at the subconscious level. We see no abuse of the trial judge's judicial discretion.

## VII.

Appellant also contends that the trial judge erred in directing a verdict in favor of the Medical Center, appellant's codefendant. The trial judge advanced as a reason for so doing that he found "no evidence in the plaintiff's case which could warrant permitting the jury to decide whether there was an agency relationship between the Center and Dr. Thimatariga." Appellant did not object to the directed verdict.

The Medical Center has moved to dismiss this appeal, insofar as it affects it. It argues that appellant's failure to object to the motion for a directed verdict precludes him from raising that issue on appeal.

Appellant, however, relies on Maryland Rule 552 a, which says:

> "In an action tried by a jury any party may move, at the close of the evidence offered by an opponent or at the close of all the evidence, for a directed verdict in his favor on any or all of the issues. Such motion shall state the grounds therefor. An objection on behalf of the adverse party to such motion shall be entered as of course."

Appellant argues that he was an adverse party to the Medical Center; that an objection to the Medical Center's motion for a directed verdict was thus automatically entered

on his behalf; and that therefore the issue of the directed verdict has been preserved. We do not agree.

The Court of Appeals has adopted the following definition of an adverse party: "a party to an action on the opposite side of an issue raised by the pleadings." *Bauman v. Woodfield,* 244 Md. 207, 219 (1966). Both appellant and his codefendant, Medical Center, were on the same side of the issue raised by the pleadings. At the time of the trial, therefore, they were not adverse parties. It is only now, since appellant has been found liable and his ex-codefendant has been determined to be free of liability that appellant perceives an adversary relationship with Medical Center. The appellant, having failed to enter an objection to the motion for a directed verdict or to oppose it in any manner, has no standing to raise that issue now. Maryland Rule 1085. This appeal, insofar as it pertains to Medical Center, is dismissed.

## VIII.

Appellant finally contends that the trial court erroneously refused to grant a new trial because of the "grossly excessive" verdict of $1,500,000, which was reduced by the trial judge to $1,200,000. Appellant compares this verdict to other personal injury cases with lower awards and infers that the jury was "in a state of passion and partiality." We note, however, that the trial judge thoroughly instructed the jury on the matter of damages and charged that its verdict was "not to be governed by sympathy, prejudice or public opinion." Furthermore, the judge said, in response to the motion for new trial, "that [the verdict] was neither so large as to be shocking, nor punitive in nature."

The Court of Appeals recently stated in *Greenstein v. Meister,* 279 Md. 275 (1977):

"It is axiomatic that whether a new trial should be granted because of the inadequacy or excessiveness of a verdict lies in the sound discretion of the trial judge. In a long line of cases,

this Court has unswervingly refused to disturb the exercise of the trial judge's discretion in denying a motion for new trial on those grounds. *See, e.g., Kirkpatrick v. Zimmerman,* 257 Md. 215, 218, 262 A.2d 531 (1970). If, in the exercise of his discretion, the trial judge determined, as he evidently did, that the amount of the verdicts did not shock his conscience, we see no basis for disturbing his judgment." 279 Md. 295.

In the instant case we too see no basis for disturbing the trial judge's refusal to reduce further the jury's award.

> *Judgment in favor of Belinda C. Chambers, appellee, affirmed; appeal as to Medical Center, appellee, dismissed; costs to be paid by appellant.*