485 A.2d 1023

**MILLER BUILDING SUPPLY, INC.**

**v.**

**Jack F. ROSEN, et al.**

**No. 253, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

Jan. 7, 1985.

Joseph W. Pitterich, Chevy Chase, (William H. Schladt, Chevy Chase, on brief), for appellant.

Mark J. Wishner, Washington, D.C. (David S. Greene on brief), Rockville, for appellees.

Argued before MOYLAN, GARRITY and ADKINS, JJ.

GARRITY, Judge.

This appeal primarily involves the interrelationship between the laws governing the availability of punitive damages for fraud arising out of a contract and for fraud that induces a contractual relationship. The appellant, Miller Building Supply, Inc. (Miller), sued its former employees, Jack F. Rosen and Bernard Hollander, for breach of fiduciary duty, fraud, and civil conspiracy. Appellant also sought punitive damages for fraud. Miller claimed that Rosen and Hollander, the appellees, in concert with David Kerr of Glenn Dale Contracting (Glenn Dale), defrauded the company out of profits totaling $258,612.42.

Appellees moved at the close of all the evidence for a directed verdict as to the issue of punitive damages asserting that since the action for fraud arose out of their employment contract, Miller had to prove actual malice to prevail. The trial court reserved its decision on this matter and permitted the issue to go to the jury based upon the following instructions:

Proof of actual malice is not necessary to justify an award of punitive damages in an action for fraud. There is no exact rule by which to determine the amount of punitive damages, but you may fix such amount as in the exercise of your discretion as a jury you would find it

would be to punish the defendant and deter others from similar acts.

. ` . . . .

For the plaintiff to recover punitive damages for fraud, it must be proved by clear and convincing evidence that an element of aggravation evidenced by malicious, deliberate, gross or wanton conduct is accompanied in the fraud.

The jury returned a verdict in favor of the appellant in the amount of $3,231.00 compensatory damages and $150,000.00 punitive damages.

After the jury's verdict, the appellees moved for judgment N.O.V. The trial court granted appellees' motion for judgment N.O.V. after finding that actual malice was the appropriate standard to support an award of punitive damages for fraud arising out of a contract, and that the evidence presented did not establish actual malice. Appellant asserts that the court erred in denying its motion for reconsideration of the judgment N.O.V. and a new trial, contending that as its contracts with Glenn Dale were induced by fraud, the applicable standard for punitive damages in this case should be implied malice. The appellant further asserts that the compensatory damages awarded to the appellant for the secret profits taken by the appellees in breach of their fiduciary duty did not conform with the court's instructions, the law and the evidence.

## The Facts

Miller has been in the wholesale business of selling kitchen cabinets and appliances to the building trade and the retail public for over forty years. Prior to 1958, Miller had also been in the business of installing kitchen cabinets and kitchen remodeling. Miller hired Jack Rosen and Bernard Hollander, the appellees, as salesmen in 1954 and 1961, respectively. Both men were discharged in January of 1982.

As salesmen for Miller, appellees sold kitchen cabinets and appliances based on a salary plus commission basis. Sales people were given two price lists to use in determining how much they would charge a customer for the kitchen equipment. The individual or list price was generally 40% higher than the contractor or builder price. Although sales people at Miller had authority to offer cabinets and appliances to individuals at the discounted contractor's price, they were expected to negotiate the best possible price since any additional profit obtained from the sale, with the exception of the sales person's commission, would accrue to Miller. The testimony of several of Miller's sales people revealed that they could and usually did sell the inventory to an individual at the discounted contractor's price in order to be competitive with other appliance stores.

Besides selling the cabinets and appliances, some of the other duties performed by sales people at Miller included designing the kitchen, having blue prints prepared, and assisting with any problems that arose during the installation. In order to close a sale with an individual customer, the sales person would often have to refer the customer to a contractor who could install kitchen cabinets or appliances that the customer had purchased, a service that Miller did not provide. Under this arrangement, the prospective purchaser would enter into an agreement with Miller to purchase the equipment and then sign a separate contract with the recommended contractor who would perform the installation work.

In the case *sub judice,* however, the appellees would refer a customer to David Kerr of Glenn Dale Contracting before they sold the customer the cabinets or appliances. The appellees would also provide Kerr with the plan of what the customer needed. Kerr would then contract with Miller to purchase the equipment that the customer required at the discounted contractor's price and resell the same equipment at the inflated list price. The customer, therefore, would sign only one contract with Kerr to buy the cabinets or appliances and have them installed.

The difference between the contractor's price and the price charged the customer for the cabinets or appliances would be paid to the appellees under the name of Buildco. The appellees claim this difference was not a profit from the sale of the merchandise, but rather their compensation from Kerr for the value of their services. Indeed, Kerr considered the appellees to be his part-time employees. Furthermore, the appellees claim that there was not written policy prohibiting a sales person at Miller from engaging in part-time employment. The president of Miller testified, however, that there was a policy that when sales people were hired, they were told that they could not engage in other part-time employment.

In 1981, Warren Miller, the president of Miller Building Supply, Inc., received a telephone call from one of his vice-presidents informing him of a report that he had received concerning possible improprieties being committed by the appellees in the performance of their job. To confirm these rumors, Mr. Miller had James Fitzpatrick, a captain in the Prince George's County Police Department, and his wife pose as potential customers for one of the appellees. Mrs. Fitzpatrick testified that Mr. Rosen explained to her:

> ... if I bought cabinets from a Mr. Kerr of Glenn Dale Contracting, that I would be getting a discount because this gentleman was a builder, and builders get a discount when they go to places like Miller Building Supply Company. That if I bought the cabinets through Mr. Rosen from the floor of Miller Building, directly from Miller Building just as a customer, a private citizen, that I would pay more.

When Captain Fitzpatrick asked Mr. Rosen to provide him with a breakdown of the costs, Mr. Rosen indicated that the cabinets and appliances would cost $5,075.00 and that the cost for installation would be $825.00. In fact, the cost of the cabinets and appliances to Glenn Dale Contracting was $3,555.80, a difference of $1,519.20, which would subsequently be paid to Mr. Rosen as "compensation". Mean-

while, Miller was under the assumption that it was selling the cabinets and appliances to Glenn Dale Contracting and not to a homeowner who had initially been its customer.

After confirming the suspicions expressed by Mr. Miller, Captain Fitzpatrick contacted Mr. Kerr. Kerr gave Captain Fitzpatrick a statement explaining his relationship with the appellees in return for a promise that he would not be sued by Miller. Based upon this information, the appellant brought suit against the appellees for $258,612.42, the payments made to the appellees (Buildco) by Mr. Kerr over a nine-year period.

## I. *Punitive Damages for Fraud*

The appellant contends that the trial court erred in granting appellees' motion for judgment N.O.V. after finding that the fraud arose out of a contractual relationship and that the proper standard to support punitive damages, therefore, was actual malice. The appellant argues that proof of implied malice was sufficient to recover punitive damages in its action for fraud because the fraud induced the contracts with Glenn Dale Contracting. Specifically, the appellant claims that the fraud committed by the appellees was in deceiving Miller into believing that Glenn Dale was the true customer, thereby inducing Miller to contract with Glenn Dale.

In determining the propriety of granting a motion for judgment N.O.V., the trial court must accept as true the evidence of the non-moving party and draw all natural and legitimate inferences that appear logical after review of such evidence. Any conflicts in evidence must be resolved in favor of the non-moving party. *Harrison v. Mayor and City Council of Baltimore*, 247 Md. 583, 234 A.2d 135 (1967); *Burns v. Goynes*, 15 Md.App. 293, 290 A.2d 165, *cert. denied*, 410 U.S. 938, 93 S.Ct. 1398, 35 L.Ed.2d 603 (1972). Since there is no dispute that the evidence did not support a finding of actual malice, we need only focus on whether the trial court was correct in ruling that actual

malice was the appropriate standard to apply in the instant case.

■ The law is clear that while punitive damages may be recovered in any pure tort action upon a showing of malice, punitive damages are not awarded for a mere breach of contract. *American Laundry Machinery Industries v. Horan,* 45 Md.App. 97, 115, 412 A.2d 407 (1980). The duty imposed upon individuals in tort is based upon law and social policy, and not necessarily the will or intention of individual parties. Permitting punitive damages for torts fosters the societal objective of deterring reprehensible conduct. Prosser, *Law of Torts,* Section 92 (4th Ed.1971). The duties in contract, however, are imposed through the consent of the parties, and apply only to the parties to the contract. *Id.* Therefore, pecuniary compensation has been held to be sufficient to compensate the aggrieved parties who have subjected themselves by consent to the risk of a breach of a contractual duty. *St. Paul at Chase Corp. v. Manufacturers Life Insurance Co.,* 262 Md. 192, 278 A.2d 12, *cert. denied,* 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971).

Where punitive damages serve their most obvious deterrent purpose are in instances of tortious conduct involving fraud. Those who attempt to engage in deliberately fraudulent conduct for profit are more likely to pause and consider the consequences if made aware that they may be compelled to pay more than they may have gained through their deceitful scheme. *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 531–32, 366 A.2d 7 (1976). Problems arise, however, with the issue of punitive damages when the tort of fraud and a contract action are merged into a single lawsuit. Specifically, an act of breaching a contractual obligation may give rise to a separate cause of action in tort.

In addressing the issue of punitive damages for fraud in connection with contractual relationships, the Court of Appeals has considered the availability of punitive damages

and the differing standards of proof by which such damages may be awarded. From these cases, this Court in *American Laundry Machinery Industries v. Horan, supra*, distilled the following general guidelines:

(1) Punitive damages are not recoverable at all in actions for breach of contract. *H & R Block, Inc. v. Testerman*, 275 Md. 36, 44 [338 A.2d 48] (1975)—hereafter referred to as *Testerman.*

(2) Such damages are recoverable in tort actions if malice is shown. The type of degree of malice required depends upon the nature of the tort.

(3) Actual or express malice requires an intentional or willful act (or omission). It "has been characterized as the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and wilfully injure the plaintiff." *Testerman* [275 Md.], at p. 43 [338 A.2d 48]; *Drug Fair v. Smith*, 263 Md. 341 [283 A.2d 392] (1971).

(4) Implied malice, on the other hand, involves something less than actual malice.[1]

.    .    .    .    .

(7) Where the tort arises out of a contractual relationship, actual, rather than implied, malice is required. *Testerman, supra*, 275 Md. at 44 [338 A.2d 48]. *See also Aeropesca Limited v. Butler Aviation International Inc.*, 44 Md.App. 610 [411 A.2d 1055] (1980).

(8) In the context of awarding punitive damages, a tort will be deemed to arise out of a contractual relationship only if "the tortious conduct and the contract were so intertwined that one could not be viewed in isolation from the other," or, in other words, if, "[i]n one form or

---

1. Implied malice is defined as conduct of an extraordinary nature characterized by a wanton or reckless disregard for the rights of others. *Wedeman v. City Chevrolet Co.*, 278 Md. at 532, 366 A.2d 7; *Smith v. Gray Concrete Pipe Co.*, 267 Md. 149, 168, 297 A.2d 721 (1972); *Conklin v. Schillinger*, 255 Md. 50, 71, 257 A.2d 187 (1969).

another, then, the tort arose directly from performance or breach of the contract." *General Motors Corp. v. Piskor,* 281 Md. 627, 637 [381 A.2d 16] (1977). Restated again in *Piskor* [281 Md.] at 640 [381 A.2d 16]:

> "In order, then, for an alleged wrong to constitute a 'tort arising out of a contractual relationship,' thereby necessitating proof of common law actual malice to permit recovery of punitive damages, we require that there be a direct nexus between the tortious act and performance or breach of the terms and conditions *of the parties' underlying contract.*" (Emphasis supplied).

■ These guidelines can be further simplified for the purposes of this case to mean that if the tort of fraud arose out of the contract, the plaintiff would have to establish actual malice to recover punitive damages.[2]

In *H & R Block, Inc. v. Testerman,* 275 Md. 36, 338 A.2d 48, a married couple sought punitive damages from a tax preparer who negligently prepared their income tax return. The plaintiffs alleged that the preparer had acted in a negligent, wanton and intentional manner. The lower court dismissed the plaintiffs' request for punitive damages and limited their recovery to compensatory damages. Although this Court reversed the trial court's decision, the Court of Appeals found that the trial court's dismissal was appropriate since the tort arose out of a contract, and the plaintiffs

---

**2.** As an alternative to the standards established to determine whether punitive damages should be awarded for fraud arising out of a contract, a new approach has been suggested that the "conduct," and not the technical classification of the wrongful act, should dictate whether a plaintiff may recover punitive damages. Strausberg, *A Roadmap Through Malice, Actual or Implied: Punitive Damages in Torts Arising Out of Contract in Maryland,* 13 U.Balt.L.Rev. 275 (1984). This well-reasoned approach is premised upon the same rationale that punitive damages are awarded in tort; to punish and deter reprehensible conduct. While we believe that the application of an implied malice standard with respect to all contract-related fraud cases is meritorious, we are constrained by the doctrine of *stare decisis* to base our decision on binding precedents established by the Court of Appeals.

failed to establish that the preparer acted with "express malice."

■ By contrast, if tortious conduct induced an individual to enter into a contract, a showing of implied malice would be sufficient to recover punitive damages. *Wedeman v. City Chevrolet Co.*, 278 Md. at 532, 366 A.2d 7; *National Micrographics Systems, Inc. v. OCE-Industries, Inc.*, 55 Md.App. 526, 543, 465 A.2d 862 (1983), *cert. denied*, 298 Md. 395, 470 A.2d 353 (1984).

In *Wedeman, supra,* the plaintiff purchased an automobile based upon the seller's representation that the vehicle had never been involved in an accident or damaged in any way. Upon discovering the falsity of these representations, the purchaser brought an action for fraud against the seller. Since the purchaser failed to establish actual malice, we set aside the jury's award of punitive damages. The Court of Appeals reversed, holding that the case did not involve a tort arising out of a contract. After determining that the dealer's fraudulent representations induced the plaintiffs to enter into the contract, the Court reinstated the jury's verdict since the purchaser was only required to prove implied rather than actual malice.

In the more recent case of *National Micrographics Systems, Inc. v. OCE-Industries, Inc., supra,* we examined a situation wherein OCE, a manufacturer of micrographic equipment, had agreed to no longer sell its products directly to its factory customers located in the Baltimore-Washington area in return for the service of NMS's marketing dealership. In contravention of such promise, however, NMS discovered some time later that OCE had continued to sell its products all along to certain concerns that had been designated as the exclusive customers of NMS. We held that the contractual relationship had been induced by fraud, and that the standard of implied malice should have been applied to determine whether punitive damages could have been recovered.

In *General Motors Corp., Inc. v. Piskor*, 281 Md. 627, 381 A.2d 16, an action was brought against an employer for

the unlawful detention of an employee suspected of stealing company property.  The employer, by coupling the employment contract with collective bargaining agreements and company policies which gave security personnel the right to detain employees leaving the plant to inspect for possible hidden property of General Motors, argued that the torts in question arose out of a contractual relationship.  In order for an alleged wrong to constitute a "tort arising out of a contractual relationship," thereby necessitating proof of common law actual malice to permit recovery of punitive damages, the Court of Appeals required that there be a "direct nexus between the tortious act and performance or breach of the terms and conditions of the parties' underlying contract."  Id., 281 Md. at 639–40, 381 A.2d 16.

The Court of Appeals held that General Motors' detention of an employee suspected of theft bore, at most, a collateral relationship to the employment contract.  Since the requirement of direct nexus had not been met, the Court held that the employer's tortious acts had arisen outside of the contractual relationship.  Accordingly, the trial court's use of an implied malice jury instruction was affirmed.

█ Applying these concepts to the facts of this case, we cannot hold that the appellees' fraudulent behavior induced the contracts between Miller and Glenn Dale, thereby allowing Miller to recover punitive damages upon a showing of implied malice.

While employed at Miller, the appellees diverted potential purchasers of Miller's kitchen equipment to Glenn Dale where they could purchase the equipment and have it installed.  Glenn Dale would take the orders of these customers and then have the appellees write a purchase order at Miller for the merchandise at reduced contractor's rates.  Glenn Dale would then sell this same equipment to the customer at a higher price, and give the difference between the price it paid Miller and the price the customer paid Glenn Dale to the appellees as their "commission."  The appellant argues that this fraudulent behavior induced Miller to enter into numerous contracts with Glenn Dale to sell

its merchandise at a much lower price than for which it could have been sold to the original customer.

The crux of appellant's complaint, however, is not the fact that they entered into a contract with Glenn Dale, but that as a result of the appellees' actions, the appellant lost the profit it might have earned had it contracted directly with the customer. As employees of Miller, the appellees had the duty to act in the best interests of their employer. Appellees violated this duty by:

1. Diverting their employer's potential customers to Glenn Dale, and then

2. Selling their employer's merchandise to Glenn Dale for less than they might have sold it to the individual customer; and finally

3. Retaining as their profit the difference in price that Glenn Dale paid Miller for the merchandise and the price that Glenn Dale sold it to the customer.

Upon analysis, it is clear that the fraud arose when the appellees violated their duties and obligations owed to Miller by virtue of their employment contract. We hold, therefore, that because the tort arose out of the appellees' employment contract with the appellant for which actual malice must be proved, the trial court was correct in granting appellees' motion for judgment N.O.V.

II. *Jury's Award for Compensatory Damages*

Miller Building Supply, Inc. also attacks the trial court's refusal to grant a new trial based upon the inadequacy of the compensatory damages awarded by the jury. The jury awarded the appellant $3,231.00 in compensatory damages for appellees' breach of their fiduciary duty. Miller, however, had requested $258,612.42 in compensatory damages.

Miller contends that the jury failed to follow the instructions of the trial judge and, therefore, the lower court abused its discretion in not granting its motion for a new trial. *Kirkpatrick v. Zimmerman*, 257 Md. 215, 216, 262 A.2d 531 (1970).

What prompted the jury in this case to award Miller the amount that it did may have been due to any one of a number of possible reasons. In her instructions to the jury, Judge Bell suggested that in determining the damages for Miller's lost profits, the jury could consider one of two theories:

> The difference between what the customer actually paid for the appliance and/or cabinets and what the customer would have paid had he not purchased through Glenn Dale.

> In considering this, you should also consider whether or not the customer would have purchased the materials through Miller once he or she realized and/or was advised they could not obtain an entire package, that is, materials and installation.

> An alternate theory which you may consider is that you could consider the measure of damages as the difference between what it cost Miller to perform its overhead and operational expenses and what it would have received had the material been merchandised and sold through David Kerr and Glenn Dale.

Besides these theories suggested by the trial judge, another possible reason for the jury's considerable reduction of the requested damages could have been that the jury found a portion of the appellant's claim had been barred by the statute of limitations. The trial court instructed the jury that if it found that Miller knew or should have known of the appellees' actions more than three years prior to filing the suit, it was to limit the award to damages incurred three years prior to filing.[3]

It is well settled that the decision to grant or deny a new trial because of the inadequacy or excessiveness of a verdict lies in the sound discretion of the trial judge. *Greenstein v. Meister*, 279 Md. 275, 295, 368 A.2d 451 (1977); *Kirkpatrick v. Zimmerman, supra.*

As the Court of Appeals observed in *Kirkpatrick:*

---

**3.** Miller's Declaration was filed on March 9, 1982.

We know of no case where this Court has ever disturbed the exercise of the lower court's discretion in denying a motion for a new trial because of the inadequacy or excessiveness of damages.

*Kirkpatrick v. Zimmerman,* 257 Md. at 218, 262 A.2d 531 and case cited therein.

In *Greenstein, supra,* the Court of Appeals further went on to state:

It is axiomatic that whether a new trial should be granted because of the inadequacy or excessiveness of a verdict lies in the sound discretion of the trial judge. In a long line of cases, this Court has unswervingly refused to disturb the exercise of the trial judge's discretion in denying a motion for new trial on those grounds. *See, e.g., Kirkpatrick v. Zimmerman,* 257 Md. 215, 218, 262 A.2d 531 (1970). If, in the exercise of his discretion, the trial judge determined, as he evidently did, that the amount of the verdicts did not shock his conscience, we see no basis for disturbing his judgment. 279 Md. 295, 368 A.2d 451.

*Thimatariga v. Chambers,* 46 Md.App. 260, 283–84, 416 A.2d 1326 (1980). Nor do we see a basis for disturbing this judgment.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

ADKINS, Judge, concurring.

The majority holds that because the appellees' fraudulent conduct arose out of a contract and because there was no evidence of their actual malice against appellant Miller Building Supply Inc. they were properly denied punitive damages. In light of the Court of Appeals' decisions the court cites I cannot quarrel with this holding. It is clearly the law of Maryland that punitive damages are not recoverable when fraudulent conduct arises out of a contract, absent proof of actual malice. Nor do I disagree with the court's conclusions that appellees' fraud arose out of a contract and that there was no evidence of actual malice.

What moves me to write separately is what I perceive to be the undesirability of the underlying rule concerning torts that arise out of contracts.

In pure tort actions punitive damages are awarded primarily to punish wrongdoers and to deter others from committing like wrongs. *Embry v. Holly*, 293 Md. 128, 141, 442 A.2d 966 (1982). Since the chief purpose of damages in a breach of contract action is to put the plaintiff in the same position he would have occupied had there been no breach punitive damages are not generally allowed in such actions. *See H & R Block, Inc. v. Testerman*, 275 Md. 36, 44, 338 A.2d 48 (1975).[1] When a tort arises out of a contract we have a hybrid situation to which the Court of Appeals has developed a hybrid solution. Punitive damages may be recovered, but only if the plaintiff can prove actual malice— "the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and wilfully injure the plaintiff." *Testerman*, 275 Md. at 43, 338 A.2d 48. Why should recovery of punitive damages be so restricted when fraud arises out of a contract, but permitted on a showing of only implied malice[2] when there is a pure fraud tort claim, not arising out of a contract?

The distinction seems to be based on notions underlying the disallowance of punitive damages in pure contract actions. It is suggested that concern for punitive damages will chill commercial transactions because "would-be contracting parties will be reluctant to enter into contracts that might ultimately result in unlimited liability." Strausberg,

---

**1.** The concept of punitive damages may present its own problems; *see* ABA Special Committee on the Tort Liability System "Towards a Jurisprudence of Injury: The Continuing Creation of a System of Substantive Justice in American Tort Law" as summarized in *Daily Record,* December 12, 1984. Those problems are not my present concern.

**2.** Implied malice is "conduct of an extraordinary nature characterized by a wanton or reckless disregard for the rights of others." *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 532, 366 A.2d 7 (1976).

*A Roadmap Through Malice, Actual or Implied: Punitive Damages in Torts Arising Out of Contract in Maryland,* 13 U. of Balt.L.Rev. 274, 293 (1984). *And see General Motors Corp. v. Piskor,* 281 Md. 627, 638–39, 381 A.2d 16 (1977). It is posited that the existence of contract-related punitive damages might inhibit parties to a contract from breaching the contract in order to pursue possibly more profitable and economically efficient ventures. *Restatement (Second) Contracts,* (1981) introductory note to Ch. 16 at 100, reporter's note at 101.

Whatever merit these arguments may have with respect to pure contract actions, they are less than persuasive when applied to an action for fraud arising out of a contract. Why should one who lies or cheats in connection with the performance of a contract escape liability because he is motivated by greed instead of hate for the other contracting party? Even in a *laissez-faire* free market system, commercial cheating should not be condoned. It seems to me that there is as much societal benefit in punishing and deterring cheating that arises out of a contract as there is in a pure tort fraud case. I perceive no societal advantage in encouraging such conduct by applying a greater obstacle to punitive damages in a contract-related fraud case than in a pure fraud case. *See generally, Strausberg,* 13 U. of Balt.L.Rev. at 292–98. As the Court of Appeals recognized in *Wedeman,* 278 Md. at 532, 366 A.2d 7, "[t]hose who are tempted ... to engage deliberately in fraudulent conduct for profit are more likely to pause and consider the consequences if made aware that they may be compelled to pay more than the actual loss sustained by the plaintiff."

I respectfully suggest that it is time for the appropriate authorities to consider the abolition of the implied malice/actual malice distinction with respect to punitive damages in contract-related tort cases, and to apply the implied malice standard in such cases.