## GENERAL MOTORS CORPORATION *v.* ROY J. PISKOR

[No. 64, September Term, 1977.]

*Decided December 23, 1977.*

The cause was argued before MURPHY, C. J., and SMITH, LEVINE, ELDRIDGE and ORTH, JJ.

*Edward S. Digges, Jr.,* and *Robert Dale Klein,* with whom were *Joseph G. Finnerty, Jr.,* and *Francis B. Burch, Jr.,* and *Frazer F. Hilder,* General Counsel, General Motors Corporation, on the brief, for appellant.

*Leo A. Hughes, Jr.,* with whom were *Robert W. Fox, Ronald L. Lapides* and *Steen, Hughes & Seigel* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

At the heart of this appeal is the question whether our holding in *H & R Block, Inc. v. Testerman,* 275 Md. 36, 338 A. 2d 48 (1975), requires an employee to prove actual malice — in the common law sense of spite, hatred or animosity — in order to recover punitive damages in an action against his employer for false imprisonment and assault.

This is the second time this case has been before us. In *General Motors Corp. v. Piskor,* 277 Md. 165, 352 A. 2d 810 (1976), we were concerned with the nature of the proof necessary to sustain an award of punitive damages in defamation cases as a matter of federal constitutional and state tort law. On remand, following our decision in *Piskor,* a jury in the Superior Court of Baltimore City (Levin, J.) presented appellee with his second award of punitive damages — this time in the amount of $35,000 — for the

non-defamation torts of false imprisonment and assault. Appellant then noted an appeal to the Court of Special Appeals, but we granted certiorari before the case was heard by that court. We now affirm.

The jury at the first trial awarded Piskor compensatory damages of $1,000 for slander, $300 for assault, and $200 for false imprisonment. The jury also assessed punitive damages of $25,000.[1] On appeal, the Court of Special Appeals affirmed. 27 Md. App. 95, 340 A. 2d 767 (1975). We then affirmed recovery of the compensatory damages for false imprisonment and assault, but reversed the slander and punitive damage awards, remanding those issues for a new trial in light of *Gertz v. Robert Welch, Inc.,* 418 U. S. 323, 94 S. Ct. 2997, 41 L.Ed.2d 789 (1974), and *Jacron Sales Co. v. Sindorf,* 276 Md. 580, 350 A. 2d 688 (1976).

At the commencement of the new trial, Piskor entered a voluntary dismissal of the slander count, leaving only the punitive damage claim to be resolved. The material testimony at the second trial differs in but a few limited respects from the evidence at the earlier trial. For convenience, then, we shall recount here our prior summary of the testimony with such minor editing and deletions as we think necessary:

> "On December 30, 1969, the date on which the incident precipitating this case occurred, Piskor, then 19 years of age, was employed by General Motors at its automobile assembly plant in Baltimore. Within a matter of minutes, shortly before the end of his shift, he twice left his place on the 'hard trim line' to visit a fellow employee who worked on the 'console line.' It was on the console line that such components as radios, tape players and tachometers were installed in automobiles, necessitating the storage of a quantity of those items nearby. Largely because of their small size and high value, these items [had] presented

---

1. The trial court in *Piskor I,* following our holding in Montgomery Ward & Co. v. Cliser, 267 Md. 406, 424-25, 298 A. 2d 16 (1972), had limited the jury to one punitive damage award for the three torts of slander, false imprisonment and assault.

something of a security problem as evidenced by the significant loss by theft which had been experienced.

"Approximately 15 to 20 minutes before the end of the shift on the day in question, Piskor made his first visit to the console line to check with his fellow employee about a ride home. He then returned to his own work area. A few minutes before the shift was to end, he again visited the same employee, this time fully clothed in his street apparel, which included an army fatigue jacket that was zipped up to the neck. The jacket had two large 'kangaroo' pockets in front, which were of sufficient size to permit the wearer to touch his hands together while inside the pockets. The foreman of the console line, whose responsibilities included the care of components being installed under his supervision, observed Piskor during both visits. In describing the second visit, he depicted Piskor as leaving with his hands in the two front pockets while 'in a stooped or hunched fashion with his hands pushed forward in the front of his jacket.' His posture and movements created the effect of his jacket 'sticking out some from his stomach.' The shift having then ended, Piskor left his friend a second time and passed through his own work area without stopping, heading directly for the exit. After witnessing all this, the foreman of the console line telephoned a sergeant on the security force and asked him to watch out for Piskor, whom he described to the sergeant, and to 'see if he noticed anything suspicious.'

"In order for the employees to exit from the assembly plant, it was first necessary for them to 'punch out' at one of the time clocks, and then to climb two flights of stairs before reaching the door to the outside. On the landing between these two stairways was a room with plate glass walls, which was called the 'guard shack.' Security guards were routinely positioned on this landing during

shift changes to inspect any packages or purses being carried by employees.

"What transpired from the moment of Piskor's arrival at the stairs, by this time crowded with many other employees, is the subject of some dispute. According to Piskor's own testimony, as he was ascending the first flight, he observed the foreman of the console line pointing at him and shouting. Once on the landing, he was 'grabbed by one guard' from whom he [broke] free only to have another guard make the same attempt. He then began to run or walk rapidly up the second flight of stairs only to find other guards blocking his path, giving him 'no other choice' but to return to the landing. When asked what occurred there, Piskor replied: 'At that point he said he wanted to talk to me. And then I asked him if he was calling me a thief.'

"According to Piskor, the guards indicated that they wanted him to go into the guard shack. He balked at this and, in this own words, 'yelled' and 'screamed' at them in an effort to discover why they were detaining him. They merely replied that they wanted to establish his identity. They [physically] 'assisted' him, he said, into the guard room and he, after resisting for some time their efforts at persuading him to open his jacket, ultimately threw it open, unbuckled his trousers gratuitously and 'showed them everything they wanted to see.' It developed that he had not concealed any General Motors' property beneath the jacket. On cross-examination, he not only repeated his earlier testimony that, when first approached, he had spontaneously shouted 'are you calling me a thief,' but also conceded that at the time he uttered a few obscenities. After demonstrating inside the guard shack that nothing was hidden beneath his jacket and denying that he had taken any property, Piskor was released." 277 Md. at 167-69.

Evidence at the second trial established that there was a 30-minute interval between shifts at the General Motors plant. During this period it was customary for the foreman of the console line to conduct an inventory check of the radios on hand to account for the number installed in the preceding eight hours. This procedure required "five, ten minutes at the most," but was not followed on the particular occasion in controversy, according to the foreman, because his suspicions were not aroused until "three or four minutes before quitting time," which would not have permitted an inventory before Piskor "could check out and [leave] to go home." The evidence revealed, however, that Piskor was detained for approximately 35 minutes.

At the conclusion of all the evidence in the second trial, appellant raised two legal issues in its motion for directed verdict that had never been presented in this case. First, appellant argued that it was immune from this lawsuit because Piskor had resorted to the grievance procedure prescribed in the collective bargaining agreement entered into between General Motors and the United Auto Workers, of which he was a member.[2] Secondly, appellant contended that because the false imprisonment and assault were torts arising out of a contractual relationship, actual malice was required to support an award of punitive damages. Hence, since no actual malice had been established, appellee could not, as a matter of law, recover such damages. The trial judge rejected both arguments and for reasons that follow, we do also.

---

2. To be precise, Piskor did not avail himself of the grievance procedure to obtain redress for any of the damages claimed in this lawsuit. The grievance was simply an effort to overturn the disciplinary sanction — loss of two weeks' pay — that management had imposed against Piskor for violating the plant rules against "threatening" conduct and "abusive language," which he had allegedly employed while in the "guard shack."

Appellant's theory is that the grievance procedures embodied in the collective bargaining agreement provide appellee with his exclusive means of redressing any and all wrongs committed by appellant in the course of the employment relationship. It is argued that the availability of these procedures promotes important federal and state labor policies and cloaks appellant with immunity against civil liability to its employees, even where the underlying dispute is only tangentially related to the employment contract, as such. *See* Meola v. Bethlehem Steel, 246 Md. 226, 234-35, 228 A. 2d 254 (1967); Henthorn v. Western Md. R.R. Co., 226 Md. 499, 504-07, 174 A. 2d 175 (1961). For reasons stated elsewhere, however, we expressly refrain from deciding this question.

## (1)

At the outset, we are confronted with a preliminary question: whether, as Piskor contends, appellant was precluded at the trial — and thus here — from raising the two substantive issues it now urges upon this Court. Piskor's argument is that appellant was foreclosed by our prior decision from raising these matters at the second trial, particularly since the failure to present them at the first trial was attributed merely to an oversight. Appellant argues that the issue of actual malice is directly related to the recovery of punitive damages and was therefore presented in timely fashion. We agree that the subject of actual malice was within the scope of our mandate regarding the punitive damage issue, even though it was presented as a question of law, rather than one of fact.

We are of the view, however, that whether utilization of the grievance procedure barred appellee from suing for damages is a matter clearly beyond the scope of our prior mandate. We remanded the case for a new trial on the punitive damages issue merely because we could not "determine the extent, if any, to which the sum allowed for punitive damages was specifically linked to the slander," for which such damages could not be awarded absent a showing of knowing falsity or reckless disregard for truth. *General Motors Corp. v. Piskor,* 277 Md. at 175.

This contention, which appellant sought to raise for the first time at the conclusion of the second trial, would challenge not simply appellee's entitlement to punitive damages, but his very right to bring the action in the first instance. What appellant overlooks in this regard is that we upheld the compensatory damages awarded by the jury on the false imprisonment and assault claims. *Id.* To that extent, then, our affirmance reflected a final judgment of appellant's liability on those two claims. Consequently, appellant is barred by res judicata from litigating not only those matters that were actually decided by a final judgment in the prior case, but also those which could have been litigated in the prior adjudication, the two causes of action unquestionably

being the same. *MPC, Inc. v. Kenny,* 279 Md. 29, 32, 367 A. 2d 486 (1977). For this reason, we hold that appellant is precluded from now relying on the labor grievance procedure to avoid liability for the torts committed by its employees.

### (2)

As we have indicated, appellant contended in its motion for directed verdict that because the torts committed here had arisen out of a contractual relationship between the parties, Piskor was required, under *H & R Block, Inc. v. Testerman, supra,* 275 Md. 36, to prove actual malice, but failed to do so; therefore, he could not recover punitive damages as a matter of law. The trial court denied the motion and then instructed the jury that an award of punitive damages would require a finding of either actual *or implied* malice. Employing a definition rooted in prior holdings of this Court, the trial judge informed the jury that implied or legal malice is "a wanton disposition grossly irresponsible to the rights of others," that is, "extreme recklessness or other disregard for the rights of others." *See Wedeman v. City Chevrolet Co.,* 278 Md. 524, 532, 366 A. 2d 7 (1976); *Smith v. Gray Concrete Pipe Co.,* 267 Md. 149, 166-68, 297 A. 2d 721 (1972); *St. Paul at Chase v. Mfrs. Life Insur.,* 262 Md. 192, 238-39, 278 A. 2d 12, *cert. denied,* 404 U. S. 857 (1971); *Conklin v. Schillinger,* 255 Md. 50, 77, 257 A. 2d 187 (1969).

If appellant is correct in its assertion that the torts complained of in this case arose out of a contractual relationship between it and appellee, then it would have been incumbent upon appellee to prove that appellant's conduct was motivated by actual malice in order to recover punitive damages. It therefore falls upon this Court to determine whether the nexus between appellant's tortious activities and the employment contract was sufficiently direct to justify imposition of *Testerman's* actual malice requirement.

Here, appellant couples the overall employment contract, including the collective bargaining agreement, with the plant rules and regulations as the basis for its contention that the false imprisonment and assault arose out of a contractual

relationship. It maintains that although the collective bargaining agreement itself is silent in this regard, it implicitly incorporates by reference the plant rules and regulations, including the following:

> "Plant Patrolmen have authority from the management to police all Company property, and to inspect all packages, tool boxes, and lunch boxes, being taken into or away from the premises."

Appellant then interprets this rule as giving its security personnel "the express right to detain employees leaving the plant to inspect for possible hidden property of GM." From this, appellant fashions its argument that the torts in question arose out of a contractual relationship.

For purposes of our decision, we shall assume without deciding that the plant rules and regulations were embraced within the employment contract, but we reject any interpretation, wholly apart from possible constitutional considerations, that would have given the security personnel the express right either to detain appellee forcibly, as was done here, or to search his person.[3] In any event, the decisive question here is not whether appellant exceeded its rights under that contract, the tortious conduct having been finally adjudicated in *Piskor,* but simply whether the relationship between the torts and the contract was such as to require proof of actual malice to support an award of punitive damages.

Appellant relies for its contention on *H & R Block, Inc. v. Testerman,* 275 Md. 36, and a series of cases following closely in its wake. It argues that this case falls squarely within the *Testerman* rule, since the tortious conduct here occurred subsequent to formation of the contract and the two were so interrelated that the conduct would not have occurred but for the prior existence of the contract.

---

3. We are not confronted here, of course, with the question whether the security personnel possessed probable cause to arrest the employee for purposes of the Fourth Amendment. We note, parenthetically, that the security personnel employed by appellant were not commissioned as "special policemen" within the meaning of Maryland Code (1957, 1971 Repl. Vol.) Art. 41, §§ 60-70. Thus, we are concerned here only with appellant's reliance on the employment contract to avoid punitive damages.

A brief review of our recent decisions in this area is in order. In *H & R Block, Inc. v. Testerman,* 275 Md. at 47, we held that "where the tort is one arising out of a contractual relationship, actual malice is a prerequisite to the recovery of punitive damages." There, as we carefully noted, the plaintiffs had not only sought punitive damages for negligent preparation of their tax returns, which we labeled "a negligent breach of contract," but had also sued alternatively for breach of contract. *Id.* at 48. Indeed, the trial judge, sitting as the trier of fact, seriously considered there the possibility of granting relief on the contract, rather than on the tort grounds. In *Testerman,* we cited with approval a collection of our prior decisions which, in our view, had foreshadowed the rule applied there. *See, e.g., Siegman v. Equitable Trust Co.,* 267 Md. 309, 314, 297 A. 2d 758 (1972) (conversion of checking account funds); *Daugherty v. Kessler,* 264 Md. 281, 284, 286 A. 2d 95 (1972) (tortious inducement to breach contract); *St. Paul at Chase v. Mfrs. Life Insur.,* 262 Md. at 236-39 (breach of contract; negligent performance of contractual obligation); *Damazo v. Wahby,* 259 Md. 627, 638-39, 270 A. 2d 814 (1970) (tortious inducement to breach contract); *Knickerbocker Co. v. Gardiner Co.,* 107 Md. 556, 569-70, 69 A. 405 (1908) (tortious inducement to breach contract).

In *Food Fair Stores v. Hevey,* 275 Md. 50, 338 A. 2d 43 (1975), decided on the same day as *Testerman,* we also invoked the requirement of actual malice. There the defendant had refused to pay retirement benefits to former employees who had allegedly violated an anti-competition clause contained in the written document creating the benefits. Because the anti-competition clause had previously been declared by this Court to be an invalid restraint upon the employees' right to earn a livelihood, *Food Fair Stores v. Greeley,* 264 Md. 105, 119, 285 A. 2d 632, 54 A.L.R.3d 177 (1972), the refusal to pay the benefits was held to constitute a conversion — and was therefore a tort arising out of a contractual relationship, requiring proof of actual malice to support an award of punitive damages. Similarly, in *Henderson v. Maryland Nat'l Bank,* 278 Md. 514, 366 A. 2d 1 (1976), the requirement of actual malice was applied in an

action for conversion stemming from the wrongful repossession of an automobile. Clearly, the conduct there arose out of a contractual relationship, since the bank had breached the conditional sales contract by seizing the automobile despite the absence of any delinquency or other grounds justifying such action.

A common thread runs through all these cases. In each instance, the tortious conduct and the contract were so intertwined that one could not be viewed in isolation from the other. Indeed, a conspicuous number of the cases in which the actual malice rule has been applied concerned tortious inducement to breach a contract. In still others, the tort consisted of nothing more than an allegedly negligent performance of contract obligations, to the extent that the tort action was accompanied by a separate cause of action sounding in contract. In one form or another, then, the tort arose directly from performance or breach of the contract. See generally McCadden, Punitive Damages in Tort Cases in Maryland, 6 U. Balt. L. Rev. 203 (1977).

It is interesting to note that actual malice does not appear to have been a prerequisite to the recovery of punitive damages in any of our recent decisions involving false imprisonment or assault. See, e.g., Montgomery Ward & Co. v. Cliser, 267 Md. 406, 419-21, 298 A. 2d 16 (1972) (assault and false imprisonment of store patron; "wanton" conduct included in definition of malice); D.C. Transit System v. Brooks, 264 Md. 578, 583-85, 287 A. 2d 251 (1972) (false imprisonment and malicious prosecution of bus passenger; defendant "breached the contract for safe carriage by unlawfully depriving [plaintiff] of his liberty" — actual malice not required); Vancherie v. Siperly, 243 Md. 366, 373-74, 221 A. 2d 356 (1966) (dictum) (assault and battery of restaurant customer; punitive damages justified where injury "wantonly inflicted"); Dennis v. Baltimore Transit Co., 189 Md. 610, 617, 56 A. 2d 813 (1948) (false imprisonment of street car passenger; punitive damages recoverable on proof of "at least ... reckless disregard of the rights of the person injured"). In none of these cases was actual malice held essential to the recovery of punitive damages, even though

the parties stood in a contractual relationship of some kind to one another. Absent was the direct relationship between the tort and the very performance or breach of the contract itself. *But cf. Drug Fair v. Smith,* 263 Md. 341, 352, 283 A. 2d 392 (1971) (assault, false imprisonment, malicious prosecution; court found it unnecessary to decide "whether punitive damages can be based on implied malice").

Recently, moreover, we considered the liability of an employer to his employee for punitive damages in the context of false imprisonment and malicious prosecution. In *Montgomery Ward & Co. v. Keulemans,* 275 Md. 441, 448-49, 340 A. 2d 705 (1975), we flatly said that where such torts occur, "punitive damages may be recovered where there is actual malice, or where malice may be implied from wantonness." There, a stock manager, while shopping in his employer's store, had been arrested by a store policeman for an alleged petty theft. No contention was advanced that the torts had arisen out of the contractual relationship between the parties, presumably because it was recognized that any such relationship could have had no direct connection with the torts.

The rule that imposes actual malice as a prerequisite to the recovery of punitive damages where the tort arises out of a contractual relationship is based upon sound considerations of public policy. The principal historical justification for awards of punitive or exemplary damages in pure tort cases is that they operate to punish reprehensible and outrageous conduct and to set an example which will serve to deter the wrongdoer and others from engaging in such conduct in the future. *Wedeman v. City Chevrolet Co.,* 278 Md. at 531; D. Dobbs, *Handbook on the Law of Remedies* § 3.9, at 205 (1973); 1 *Sedgwick on Damages* § 347 (9th ed. 1920).

However valid these policy objectives might be in respect to pure torts involving conduct of an extraordinary and outrageous character, they have little relevance in the area of contract law, where breaches of contract do not ordinarily engender as much resentment or mental or physical discomfort as do torts of the former variety. Hence, the rule has developed that punitive damages may never be recovered in

pure breach of contract suits, *Food Fair Stores v. Hevey,* 275 Md. at 57; *St. Paul at Chase v. Mfrs. Life Insur.,* 262 Md. at 236, on the theory that it is sufficient to provide pecuniary compensation to the aggrieved party without the necessity of assuaging his feelings or allaying community outrage by means of exemplary damages. 5 *Corbin on Contracts* § 1077, at 438 (1964). A further reason for prohibiting recovery for punitive damages in pure contract cases is that the mere availability of such a remedy would seriously jeopardize the stability and predictability of commercial transactions, so vital to the smooth and efficient operation of the modern American economy. *See Vernon Fire & Casualty Insurance Co. v. Sharp,* 264 Ind. 599, 349 N.E.2d 173, 180 (1976).

There is, however, a class of actions that lies somewhere in the gray area separating pure torts from contract cases. These are the so-called "torts arising out of contractual relationships" which occasioned the genesis of the rule in *Testerman.* Such torts "frequently bear close resemblance to actions for pure breach of contract" in which punitive damages are not recoverable. *Wedeman v. City Chevrolet Co.,* 278 Md. at 529. Nevertheless, torts of this genre often involve conduct of the most opprobrious kind, which society might well seek to punish and deter by means of exemplary damages. Recognizing that torts arising out of contractual relationships exhibit characteristics of both tort and contract actions, we sought in *Testerman* to fashion a workable rule governing the recovery of punitive damages which would be more stringent than that applied in pure tort cases, but which at the same time would allow the possibility of recovery where the particular conduct clearly warranted the imposition of such damages.

Plainly, this is not such a case as would trigger the *Testerman* requirement of actual malice. Here, we deal with torts in the purest sense of that term — false imprisonment and assault. Like that of their counterparts in *Keulemans,* the conduct of the actors during the critical moments in this case bore, at most, a collateral relationship to the employment contract — at least in regard to performance or breach of its conditions.

In order, then, for an alleged wrong to constitute a "tort arising out of a contractual relationship," thereby necessitating proof of common law actual malice to permit recovery of punitive damages, we require that there be a direct nexus between the tortious act and performance or breach of the terms and conditions of the parties' underlying contract. As we have intimated, no such nexus existed here. We hold, therefore, that the trial court correctly permitted the jury to award appellee punitive damages for false imprisonment and assault based on a finding of either actual or implied malice on the part of appellant.

*Judgment affirmed; appellant to pay costs.*