MEDICAL MUTUAL LIABILITY INSURANCE
SOCIETY OF MARYLAND *v.*
GERALD A. MILLER

[No. 1457, September Term, 1981.]

*Decided November 1, 1982.*

The cause was argued before MOORE and MASON, JJ., and PERRY G. BOWEN, JR., Associate Judge of the Seventh Judicial Circuit, specially assigned.

*Kenneth Armstrong,* with whom were *Donahue, Ehrmantraut & Montedonico, Chartered* on the brief, for appellant.

*Stuart Salsbury* and *Patrick O'Doherty,* with whom were *Israelson & Jackson, P.A.* and *Max Israelson* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

Medical Mutual Liability Insurance Society of Maryland (Medical Mutual or the insurer), appellant, seeks reversal of a declaratory judgment in favor of its insured, Gerald A. Miller, M.D., appellee, that it improperly disclaimed liability in a medical malpractice suit because of an alleged breach of the policy's cooperation clause. The Superior Court of Baltimore City (Harris, J.) voided Medical Mutual's disclaimer and ordered that the doctor be extended full coverage. For the reasons stated, we shall affirm.

The somewhat involved facts and at times conflicting testimony in this case may be summarized as follows:

## I

On November 17, 1978, Dr. Miller performed lens implant surgery on Mrs. Feulner's right eye at St. Agnes Hospital in Baltimore. The experimental procedure required, under federal law, her informed consent as evidenced by a written agreement signed by her after a full explanation of the

attendant consequences and risks.[1] Dr. Miller claimed that on the morning of surgery he obtained Mrs. Feulner's signature while she was under pre-operative sedation. She had no memory of signing any document on that date.

Shortly after surgery an infection developed, but Mrs. Feulner was discharged from the hospital. On December 7, 1978, she was examined in Dr. Miller's office. He told her and her husband that the lens had to be removed immediately. He presented them with a five-page document which he said he needed for the lens manufacturer. Mrs. Feulner signed the last page, but neither she nor her husband read the document which was a standard informed consent agreement.[2]

Thereafter, without knowledge of the Feulners, Dr. Miller admittedly backdated the document to November 17, 1978, the date of the operation, and signed it. The lens was subsequently removed, and in follow-up office visits, Dr. Miller assured Mrs. Feulner that she would regain her vision. The Feulners sought independent medical advice and learned that she was permanently blind in the right eye. They then contacted their family lawyer, Patrick A. O'Doherty, Esq., who wrote to Dr. Miller on May 22, 1979, requesting all records, including any informed consent agreements. Dr. Miller contacted his malpractice insurer, Medical Mutual, and completed a claim form, noting that the claim would probably involve "lack of informed consent." This form, the informed consent document, an adverse reaction report and other office records were sent to K. Robert Phillips, claims manager of the insurer.

Mr. Phillips and Mr. O'Doherty first spoke about the Feulner case on July 12, 1979, when Mr. O'Doherty advised Mr. Phillips that Dr. Miller had not obtained an informed

---

1. An informed consent must be obtained from all candidates for intraocular lens implant surgery pursuant to regulations of the Food and Drug Administration. 21 C.F.R. §§ 813.120, 813.130 (1982).

2. The consent form warns that the results of intraocular lens implant surgery cannot be guaranteed and that complications may be induced which would not otherwise arise, including infection.

consent from Mrs. Feulner before performing surgery. On July 31, 1979, Mr. Phillips forwarded copies of the consent form, adverse reaction report and office records to Mr. O'Doherty, noting that the consent form was signed by Mrs. Feulner. Thereafter, Mr. O'Doherty told Mr. Phillips the consent form had been backdated from December 7, 1978, when it was signed in Dr. Miller's office, to the date of the operation. Mr. Phillips agreed to obtain the original hospital records for Mr. O'Doherty's review, and acknowledged in a note to the file dated August 8, 1979, that informed consent was a very viable issue in the case.

Mr. Phillips met Dr. Miller for the first and only time on August 23, 1979, and his claim file contains a report of that event. The report reveals the following admissions by Dr. Miller: The original consent form was obtained while Mrs. Feulner was sedated; when this form was temporarily lost, he obtained a second form on December 7, 1978, and backdated it to November 17, 1978; Doris Rosier, his secretary, witnessed the Feulner signature on the second form; this form was destroyed when he relocated the first one. Also, he orally explained the nature and extent of the eye surgery and the associated risks to the Feulners when they first came to see him. Mr. Phillips did not question Dr. Miller regarding O'Doherty's accusations that certain hospital records were missing and that the doctor had reconstructed various office records.

Mr. Phillips and Mr. O'Doherty discussed the case again on September 26, 1979. On September 30, 1979, Mr. Phillips, in a note to his file, reported that Dr. Miller freely admitted that he obtained the consent form while Mrs. Feulner was under sedation, and noted that the defense of informed consent might become a serious problem. On October 3, 1979, Dr. Miller, in a written response to Mr. Phillips' telephone inquiry, stated that in fact he had not explained the implant procedure and its complications to the Feulners, but had only talked about post-operative care.

While the insurer's standard procedure is to give the insured a choice of three defense lawyers, in this case Mr.

Phillips advised Dr. Miller on November 1, 1979, that John F. King, Esq., had been assigned to represent him. Dr. Miller was not informed, nor did he know, that Mr. King was also Medical Mutual's general counsel.

Medical Mutual assumed Dr. Miller's defense on November 1, 1979, in preparation for a hearing before the Health Claims Arbitration panel. On January 17, 1980, Dr. Miller told Mr. King in a meeting that he had never discussed the complications of the operation with Mrs. Feulner and had obtained her signature when she was sedated. He said that he was "zapped" on the issue of informed consent and agreed to settle.

Dr. Miller was deposed on June 30, 1980, after first meeting with Angus Everton, Esq., Mr. King's associate. Questioned about the second consent form dated December 7, Dr. Miller said his secretary, Doris Rosier, had Mrs. Feulner sign it in his presence. This was the form he allegedly destroyed. When asked what happened to it, Dr. Miller claimed it was available and produced page five of a consent form containing the signatures of Mrs. Feulner and Miss Rosier, his secretary. Mr. O'Doherty commented that a layman could see that both names were written with the same shaky handwriting.

A summary of Dr. Miller's deposition by Mr. Everton dated July 7, 1980, noted that Mr. O'Doherty asked Dr. Miller about his office records, implying they were written after the fact with the same pen, and that the consent form was not signed by Mrs. Feulner. Mr. O'Doherty believed her signature had been traced and requested that it be submitted to a handwriting analyst. Mr. Everton also stated, ". . . that it was obvious from the deposition that he (Miller) did not obtain such informed consent, whether or not he obtained the plaintiff's signature on the consent form." In a memorandum to the files dated August 30, 1980, Mr. Phillips noted that both the claims department and Mr. King believed that the case was almost "totally indefensible." He also observed that the circumstances involving the signing of the consent and the doctor's alleged attempts to cover up might aggravate damages.

Miss Rosier stated at a deposition on November 11, 1980, that she did not witness the consent form nor did she see Mrs. Feulner sign it. She also said the office records were not original in that charges for office visits were not noted in the righthand column and the name and address at the top were in the handwriting of Goldie Miller, Dr. Miller's mother.

The next day, Mr. O'Doherty also suggested that if Medical Mutual planned to raise a coverage issue, either it or Mr. King should inform Dr. Miller so he should retain independent counsel. Mr. King called Mr. Phillips to report that Miss Rosier in her deposition had contradicted Dr. Miller regarding the office records and the consent form. Then he called Dr. Miller, who agreed to correct his deposition. However, Dr. Miller's further deposition was never rescheduled.

On December 15, 1980, Mr. Phillips met with Mr. King and reviewed the entire Miller case file. The next day, Mr. Phillips sent Dr. Miller a letter withdrawing coverage and disclaiming liability.[3]

Dr. Miller filed a declaratory judgment action against Medical Mutual in June 1981. Called as the insurer's witness at trial, he testified that he had told Mr. Phillips the preceding August that he was "zapped" on the consent issue and had no defense. Dr. Miller also denied that there was anything deceptive about rewriting his office records. The originals, he explained, were stained with chemicals and unreadable. He recopied them faithfully to make them presentable.

The Superior Court of Baltimore City found that the

---

**3.** Dr. Miller's policy contained the following condition:

"The INSURED shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the INSURED because of injury or damage with respect to which insurance is afforded under this policy; and the INSURED shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The INSURED shall not, except at its own cost, voluntarily make any payment, assume any obligation, or incur any expense other than for first aid to others at the time of accident."

disclaimer of liability was null and void and ordered the insurer to extend the doctor full coverage under his policy. In an oral opinion, Judge Harris said that Dr. Miller had been prejudiced by Mr. King's dual representation and that Medical Mutual had not disclaimed liability within a reasonable time after notice of the insured's failure to cooperate.[4]

Following this judgment, Medical Mutual contacted Dr. Miller's personal counsel, Max Israelson, Esq., and insisted that it had a right under the policy to control the defense of the Feulner case before the arbitration panel. The insurer appointed Thomas Farrington, Esq., as defense counsel for Dr. Miller, who strenuously objected and, through counsel, advised Medical Mutual that it would assume the defense of the action at its peril. The insurer did defend the case before the arbitration panel, and the proceeding resulted in a total judgment against Dr. Miller for $500,000, $200,000 of which was designated as punitive damages.

The following issues have been presented on this appeal:

1. Is Medical Mutual estopped from disclaiming liability because Dr. Miller was prejudiced by Mr. King's dual representation?

2. Did Medical Mutual fail to disclaim coverage within a reasonable time?

3. Did Medical Mutual fail to establish actual prejudice as a result of Dr. Miller's breach of his policy's cooperation clause?

4. Does the public policy of this State preclude insurance coverage for punitive damages arising out of alleged criminal conduct of the insured?

---

4. The trial judge also noted that the purpose of the statute creating Medical Mutual Liability Insurance Society of Maryland was to provide insurance coverage in this type of malpractice case. Md. Ann. Code, Art. 48A, § 548 (1957, 1979 Repl. Vol.).

## II

Preliminarily, it is appropriate to state this Court's scope of review in this type of case.

> "In a declaratory judgment proceeding, the trial court may sit not only to determine the issues of law but as the trier of the facts, and its conclusions as to the facts will not be disturbed unless found to be clearly erroneous. Rule 1086." *Aetna Casualty & Surety Co. v. Brethren Mutual Insurance Co.,* 38 Md. App. 197, 206 (1977).

Turning to the first issue — Mr. King's dual representation — this Court must express its displeasure at Medical Mutual's failure to address this point in its brief. It is clear that the court below granted the declaratory judgment in Dr. Miller's favor on two grounds, one of which was "the double representation by Mr. King of both the insurer and the insured." Appellant has ignored this holding.

The Court of Appeals in *Fidelity & Casualty Co. v. McConnaughy,* 228 Md. 1, 9-12 (1962), considered the effect of an attorney's dual representation under an analogous factual situation. In *McConnaughy,* the insured was involved in an automobile accident and his insurance company was initially unable to locate any witnesses to support his version of what occurred. The insured produced two witnesses to corroborate his story, each of whom signed a statement that he had been an eyewitness to the accident. At a later deposition of one of them, however, the insurer learned that the insured had asked these two "witnesses" to testify falsely and that neither of them had seen the accident. The attorneys for the insured, who also represented the insurance company, subsequently questioned him under oath and verified his breach of the policy's cooperation clause. *Id.* at 5.

Generally, where the interest of the insured and insurer run parallel, an attorney representing both may do so without offending ethical mandates. When faced with the

question of breach of a cooperation clause, however, the situation may change dramatically. As stated in *McConnaughy:*

> "[I]f in the course of the dual representation an actual conflict develops between the interests of the insured and those of the insurer, the lawyer must either withdraw entirely from the case or continue to represent one of the clients only.... *Various courts have condemned such dual representation in circumstances analogous to those in the instant case, and several have held that when it occurred, the insurance company had waived its right to disclaim or was estopped to do so." Id.* at 10. (Emphasis added.)

The trial court in this case found that Dr. Miller was "in effect pouring his heart out before the general counsel for the Medical Mutual Liability Insurance Society." The court determined that an apparent conflict of interest had arisen as early as January 1979 when Dr. Miller first discussed the case with Mr. King and disclosed that he had not explained the potential risks of the surgical procedure to the patient. Medical Mutual's interest in pursuing the option of disclaiming liability was in direct conflict with Dr. Miller's interest in maintaining his malpractice insurance coverage. This situation, in the opinion of the court below, prejudiced the doctor to such an extent as to preclude Medical Mutual from disclaiming liability. We recognize, of course, that in *McConnaughy* the Court did not find that the insurer had waived its right to disclaim because of dual representation under the facts of the case.[5] The circumstances here are markedly different and we do not find that Judge Harris' conclusion was clearly erroneous, particularly in view of Medical Mutual's failure to challenge it.

---

5. The court in *McConnaughy* held that the insurer was not estopped from disclaiming liability because the information elicited from the insured to verify his breach of the cooperation clause could have been obtained from the company's investigator or counsel not representing the insured.

### III

The decision of the court below also rested on its finding that Medical Mutual failed to make a timely disclaimer of liability. An insurer will be estopped from disclaiming liability if it does not repudiate liability within the reasonable time after becoming aware of the insured's failure to cooperate. *Traveler's Insurance Co. v. Godsey,* 260 Md. 669, 675 (1971).

In *Godsey, supra,* an insurance company disclaimed liability after it had "fortuitously" discovered that the account of an auto accident given by its insured to the company's investigators and attorneys, and consequently offered at trial, was in "material and prejudicial variance with the facts." *Id.* at 671. The company was "justifiably unaware of information" that its insured had fraudulently withheld the true facts and substituted a version designed to bring about a settlement in the claimant's favor. *Id.* at 672. The Court of Appeals held that the insurer was not estopped from disclaiming liability, having asserted the breach of the cooperation clause as soon as it acquired knowledge of the insured's failure to cooperate. *Id.* at 675. *See Fidelity & Casualty Co. v. McConnaughy,* 228 Md. 1, 9 (1962) (insurer not estopped from disclaiming liability because liability repudiated nine days after learning of insured's breach of cooperation clause). *See also Apex Mutual Insurance Co. v. Christmer,* 240 N.E.2d 742, 748 (Ill. 1968).

In accordance with this law, Judge Harris determined that Medical Mutual was estopped from disclaiming liability because it "waited an inordinately long length of time" to disclaim coverage after it was reasonably certain that Dr. Miller had initially misled Mr. Phillips. His analysis of the facts showed that Phillips either knew or should have known of the discrepancy in Dr. Miller's statements by January 1980, when he made "a confession" to King who promptly relayed it to Phillips. The Phillips' memorandum of the August 23, 1979 meeting with Dr. Miller clearly recorded Dr. Miller's assertion to him that he had originally "explained in detail the nature and extent of the surgery and

the associated risk" and that Mrs. Feulner was "fully informed of the risks and gave her consent."

Even prior to the confession to King, in his October 3, 1979 letter to Phillips, Dr. Miller recanted his prior statement that Mrs. Feulner had been orally advised of the risks of surgery and stated he gave only an explanation of the post-operative care. By the time of the confession, Dr. Miller conceded that there was no defense to the informed consent, that he was "zapped" on that issue, and that he never referred her to the form on the initial visit; nor did he at any time tell her of any of the complications. Since Phillips received the written memorandum of that conference within eleven days of the meeting, he either knew or should have known then of the problem with Dr. Miller's cooperation under the terms of the policy and should have disclaimed promptly, not eleven months later in December, 1980.

Medical Mutual's assertion that neither it nor King knew of the discrepancies until November 1980, is totally contrary to the evidence in this case, and, even if believed, would be attributable to the fact that no effort whatsoever was made to investigate any of the factual contentions. Although an insurance company may rely on the presumption that the insured has stated all the material facts honestly and need not rely on the plaintiff's version of events, an insurer is charged with knowledge of facts which it knows or which with reasonable diligence by means of inquiry or investigation it could have discovered. See *McConnaughy, supra,* 228 Md. at 9. *British and Foreign Marine Ins. Co. v. Cummings,* 113 Md. 350, 359 (1910). It cannot, after the damage is done, take advantage of its own inaction as a ground of defense. *Shoop v. Fidelity & Deposit Co. of Maryland,* 124 Md. 130, 139 (1914).

Despite Phillips' knowledge of Dr. Miller's various accounts and of O'Doherty's suspicions of improper actions, Medical Mutual did nothing to investigate these matters and gave serious consideration to a potential coverage problem only after the depositions of Dr. Miller's nurse and his mother. Although these depositions may have provided new revelations about the extent of the doctor's misconduct, the

court found that Medical Mutual had knowledge of the breach of the cooperation clause almost a year before it disclaimed liability. This conclusion was not clearly erroneous. It is amply supported by the evidence.

## IV

Medical Mutual argues at some length that it established "actual prejudice" as required by Art. 48A, § 482 of the Annotated Code of Maryland, and Judge Harris erred in failing to find such prejudice.[6] The inevitable truth is, however, that where — as here — the insurer has been held estopped to disclaim, the question of prejudice becomes irrelevant. This is the plain implication of Judge Harris' opinion. We find no error.

## V

Medical Mutual's next argument is that the public policy of this State precludes insurance coverage for punitive damages based upon alleged criminal conduct of the insured. This issue was not raised nor decided below and is not, therefore, properly before us. Maryland Rule 1085. At all events, this position was rejected by the Court of Appeals in *First National Bank of St. Mary's v. Fidelity & Deposit Co.,* 283 Md. 228 (1978).[7]

*Judgment affirmed; costs to be paid*
*by appellant.*

---

**6.** "Where any insurer seeks to disclaim coverage on any policy of liability insurance issued by it, on the ground that the insured, or anyone claiming the benefits of the policy through the insured, has breached the policy by failing to cooperate with the insurer or by not giving requisite notice to the insurer, *such disclaimer shall be effective only if the insurer establishes, by a preponderance of affirmative evidence, that such lack of cooperation or notice has resulted in actual prejudice to the insurer.*" Md. Ann. Code, Art. 48A, § 482 (1957, 1979 Repl. Vol.). (Emphasis added.)

**7.** In *First National Bank of St. Mary's v. Fidelity & Deposit Co.,* the Court of Appeals noted most of the cases cited by Medical Mutual in support of the proposition that public policy precludes insurance coverage for punitive damages. The court found the rationale of those cases unconvincing. 283 Md. 228, 232-33 (1978) (citing Northwestern National Casualty Co. v. McNulty, 307 F.2d 432 (5th Cir. 1962) as the leading case denying coverage for punitive damages).