559 A.2d 813

**Gerald A. MILLER**

v.

**Amelia R. SCHAEFER.**

**No. 1630, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

June 30, 1989.

Certiorari Granted Nov. 13, 1989.

Melvin J. Sykes, Baltimore, for appellant.

Livia Thompson, Jeffrey P. Sinesky, Steven H. Freeman, Jill L. Kahn, New York City, Michael J. Travieso, Kathryn Kelley Hoskins, Gallagher, Evelius & Jones, Baltimore, for amicus curiae, Anti–Defamation League of B'nai Birith.

Patrick A. O'Doherty, Baltimore, for appellee.

Before GILBERT, C.J., and KARWACKI and WENNER, JJ.

KARWACKI, Judge.

On October 1, 1984, the appellee, Amelia R. Schaefer filed a medical malpractice claim in the Health Claims Arbitration Office against the appellant, Gerald A. Miller, M.D. A hearing was held in October, 1987, before a Health Claims Arbitration panel which resulted in a unanimous award against the appellant for $1.00 in compensatory damages and $25,000 in punitive damages. Both parties rejected that award and brought actions to nullify the award in the Circuit Court for Baltimore City.

On June 16, 1988, a jury returned a verdict in favor of appellee in the amount of $350,000 in compensatory damages and $750,000 in punitive damages. Appellant filed a motion for judgment notwithstanding the verdict or for a new trial on June 24, 1988. The trial court denied appellant's motion for judgment notwithstanding the verdict but granted the motion for a new trial unless appellee consented to a remittitur of compensatory damages from $350,000 to $50,000. Appellee filed a consent to the remittitur and judgment was entered on August 5, 1988, against the appellant for $50,000 in compensatory damages and $750,-000 in punitive damages. Appellant filed a timely appeal from the judgment for punitive damages. He poses two questions for our review:

1.) Whether the judgment for punitive damages should be reversed because the tort in this case arose out of a contractual relationship and there is no evidence of actual malice?

2.) Whether the trial court erred in denying appellant's motion for a mistrial and a new trial on punitive damages sought on the ground that appellee's counsel impermissibly injected the issue of religion into the proceedings?

Because we answer appellant's first question in the affirmative and reverse the judgment entered against him for

punitive damages, we need not address appellant's second contention.

## FACTS

Viewing the evidence in a light most favorable to the appellee, as we must in reviewing the denial of a motion for judgment notwithstanding the verdict pursuant to Rule 2-532, *Impala Platinum v. Impala Sales*, 283 Md. 296, 327, 389 A.2d 887 (1978); *New Summit Associates v. Nistle*, 73 Md.App. 351, 356, 533 A.2d 1350 (1987); *Hamilton v. Ford Motor Credit Co.*, 66 Md.App. 46, 59, 502 A.2d 1057 (1986), we conclude that the following facts were proven at trial.

The appellee began regularly seeing appellant, a board certified ophthalmologist, for annual eye check-ups in 1973. In June, 1982, when appellee was 72 years old, she complained to appellant that she was having difficulty reading newspaper print. Appellant examined her eyes and determined that she was developing a cataract in her right eye. Appellant prescribed stronger lenses for appellee's eyeglasses. The new prescription improved her vision and appellee was satisfied with the glasses.

One year later, on July 6, 1983, appellee saw appellant for her regular eye examination. She again complained that she was having trouble reading. Without conducting an examination of the eye and without testing the appellee's vision,[1] appellant advised appellee that the cataract in her right eye needed to be removed. At trial, appellee testified that appellant did not describe the procedure which would be employed in removing the cataract or the risks involved in that surgery. Her only knowledge of cataract operations

---

1. There was a sharp conflict in the evidence as to these facts. Appellant claimed to have performed an acuity check on that date, a check of the binocularity of the eyes, and a glaucoma test, the results of which he purported to have written down contemporaneously on his medical records. He testified that her vision had slipped from 20–40 to 20–80 in the right eye. Appellee contended the notes of that July 6, 1983 visit were written by the appellant much later and that no visual acuity test, nor any other tests, were performed on her that day.

consisted of what she had seen on a public broadcasting television program two months earlier. After consulting with a friend who had accompanied her to appellant's office, appellee agreed to have appellant perform a cataract operation on her right eye on an out patient basis at St. Agnes Hospital.

The surgery was performed on July 27, 1983. Appellant removed the cataract in appellee's right eye and implanted an intraocular lens [2] in that eye. The operation went smoothly and appellee went home that same day. The hospital pathology report confirmed the existence of the cataract and noted "considerable opacity" of the lens appellant removed from appellee's right eye.

Appellee's testimony was that she knew nothing prior to surgery about an intraocular lens implant and was willing only to undergo a simple cataract removal. An informed consent form for cataract operation and the implantation of an intraocular lens purportedly signed by appellee was produced by appellant at trial. Appellee, however, vehemently disputed that she signed any such document.

The informed consent form that was introduced in evidence contained the appellee's printed name and the date of July 27, 1983 (both written by the appellant). The form provided for the signature of the patient, the doctor and a witness. Both the doctor and witness signature blanks

---

**2.** The intraocular lens cataract operation was developed in the 1970's and experimentally tested for several years. Pursuant to federal statute, the Food and Drug Administration issued regulations in effect from January 13, 1978 through December 31, 1982, closely governing its use. These regulations required that the patient be informed, *inter alia,* that intraocular lenses were experimental and were being investigated for safety and effectiveness. The required consent form spelled out the possible complications of the operation and provided for the signature of the patient. Prior to the expiration of the law, the American Academy of Ophthalmology adopted the federal requirement as a standard for all ophthalmologists and that standard was in effect at the time of appellee's operation. Both parties' experts at trial testified that by December 31, 1982, when the federal regulations expired, intraocular lens implantation as part of cataract surgery was no longer experimental and was overwhelmingly successful.

were signed by appellant. The portions of the form for noting the time and place of obtaining the consent were not completed. Appellee denied signing that form or seeing any consent form whatsoever. This consent form was not part of appellee's hospital records at St. Agnes. It was produced by appellant when appellee requested that he turn over her medical records.[3]

Three days after surgery, on July 30, 1983, appellee felt pain and telephoned appellant. Appellant saw appellee and determined that her right eye was infected. He admitted her to the hospital that day, treated her with antibiotics and scheduled her for a vitrectomy (removal of pus from the eye) on July 31, 1983. The next day, however, appellee was not taken for the surgery nor did the appellant see her. Rather, appellee was informed that her surgery had been rescheduled for August 1, 1983.

The vitrectomy results revealed a significant quantity of purulent material in the eye. Appellee was prescribed antibiotics and not discharged from the hospital until August 14, 1983. During this period, she suffered constant pain and was unable to see out of her right eye.

On August 24, 1983, appellee returned to appellant's office. He again determined that her right eye was "full of infection." There, appellant treated her with 187 shots of laser therapy. Appellant treated appellee on two subsequent visits with laser shots to open up the membrane of the eye that was blocking her vision. Following the last treatment on November 12, 1983, appellant told appellee she had 20/40 vision in her right eye.

---

**3.** The appellee also offered evidence that in 1978 appellant was accused of rewriting office records and forging a patient's signature to an informed consent form for an intraocular implant. *See Medical Mut. Liab. Ins. v. Miller,* 52 Md.App. 602, 451 A.2d 930 (1982). Appellant admitted these actions and was sanctioned by the Commission of Medical Discipline of Maryland in 1985. The Commission ordered that the appellant's license to practice medicine be suspended unless he complied with certain conditions, including having in each operative patient's chart a copy of an informed consent form which had been dated, signed and witnessed by a third party.

Appellee again visited appellant's office on November 28, 1983, at which time she received a new prescription for eyeglasses. After this visit, appellee sought the opinions of other ophthalmologists, including Dr. Dennis A. Gleicher, appellee's expert witness at trial. Dr. Gleicher opined that appellee's chronic pain, retinal degeneration, decreased visual acuity and light sensitivity were all caused by appellant's failure to comport with the required standards of care for obtaining informed consent and treating appellee's postoperative infection.

At trial, the jury by special verdict pursuant to Rule 2–522(c) found: 1) that appellant did not "comply with the standards of care applicable to him in making adequate disclosure of material facts to the [appellee] relative to the treatment she underwent" and that appellee did not "knowingly and intelligently agree to the procedure being done," 2) that appellant did not "comply with the standards of care applicable to him in all his preoperative procedures and postoperative care with respect to the [appellee]" and, 3) that appellant's negligence was the proximate cause of appellee's injury.

In his brief to this Court, appellant concedes that the evidence produced at trial was sufficient to establish his negligence in appellee's postoperative care. Appellant does not contest the award of compensatory damages.

## ISSUE PRESENTED

The central issue in this appeal is whether *H & R Block, Inc. v. Testerman,* 275 Md. 36, 338 A.2d 48 (1975), required appellee to prove actual malice as a prerequisite to the recovery of punitive damages in her medical malpractice action against appellant. Appellant contends that he and the appellee entered into a contractual relationship whereby appellee agreed to have him perform cataract surgery on her right eye. Hence, any negligence incident to that agreement constituted a tort arising out of a contractual relationship subject to the rule of *Testerman.* We agree. A review of *Testerman* and its progeny is instructive.

In *Testerman,* a married couple sought punitive damages from their tax consultant who negligently prepared their income tax return. The trial court, dismissing the plaintiffs' request for punitive damages, limited their recovery to compensatory damages. The Court of Appeals affirmed, holding that actual malice is a prerequisite to the recovery of punitive damages where the tort is one which arises out of a contractual relationship between the parties. *Id.* at 44, 338 A.2d 48; *See also, Henderson v. Maryland Nat'l Bank,* 278 Md. 514, 519, 366 A.2d 1 (1976). The Court characterized actual malice as "the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *Testerman, supra,* 275 Md. at 43, 338 A.2d 48. Since the plaintiffs in *Testerman* had contracted with H & R Block for the preparation of their tax return, they were not entitled to punitive damages in the absence of evidence that H & R Block's employees acted with actual malice in failing to prepare their tax return properly.

In a succession of subsequent cases, the contours of the *Testerman* holding have been outlined. In *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 529, 366 A.2d 7 (1976), the Court of Appeals held that before a tort can be characterized as arising out of a contractual relationship, the contractual relationship must preexist the tortious conduct. There, a purchaser bought a used automobile that the seller had expressly represented as never having been involved in an accident. When the purchaser later discovered the falsity of the seller's representation, she brought an action for fraud. Based upon these facts, the jury awarded the purchaser punitive damages. The Court agreed, holding that "since the fraud committed here did not arise out of a contractual relationship, but instead induced [purchaser] to enter into the contract, this case is not within the ambit of the *Testerman* holding." *Wedeman, supra,* 278 Md. at 529–30, 366 A.2d 7. The tort must find its source in the

contract without which the wrong could not be committed. *Id.* at 529, 366 A.2d 7.

If the fraud alleged does not arise out of a contract between the parties, a lesser requirement for an award of punitive damages applies. The injured party does not have to prove actual malice, but instead will establish his claim if he shows implied malice. *Id.* at 530, 366 A.2d 7. *See also, Aeropesca Ltd. v. Butler Aviation,* 44 Md.App. 610, 625, 411 A.2d 1055 (1980), *cert. denied,* 287 Md. 749 (1980). Implied malice is defined as conduct of an extraordinary nature characterized by wanton or reckless disregard for the rights of others. *Wedeman, supra,* 278 Md. at 532, 366 A.2d 7; *Cf. Smith v. Gray Concrete Pipe Co.,* 267 Md. 149, 168, 297 A.2d 721 (1972).

Based upon *Wedeman,* in *National Micrographics v. OCE–Industries,* 55 Md.App. 526, 543, 465 A.2d 862 (1983), we held that:

> [W]hen one party fraudulently induces another to enter into a contract, proof of implied malice may permit recovery of punitive damages. This standard applies even if the parties had a prior contractual relationship that is not the subject of the fraud claim.

We determined that even though the parties were acting under a prior contractual agreement, a second contract, induced by fraud, was executed. Therefore, to obtain punitive damages on their fraud claim, the plaintiffs needed only to prove implied malice. *Id.* at 544, 465 A.2d 862.

The Court of Appeals added another requirement to the definition of tort arising out of a contract in *General Motors Corp. v. Piskor,* 281 Md. 627, 381 A.2d 16 (1977). The Court held that an employer's unlawful detention of an employee suspected of theft did not arise out of a contractual relationship. Judge Levine, speaking for the Court, stated:

> In order, then, for an alleged wrong to constitute a "tort arising out of a contractual relationship," thereby necessitating proof of common law actual malice to permit

recovery of punitive damages, *we require that there be a direct nexus between the tortious act and performance or breach of the terms and conditions of the parties' underlying contract.* (Emphasis supplied.)

*Id.* at 640, 381 A.2d 16. The Court found that the torts complained of in *Piskor*—false imprisonment and assault—were collateral to the employment contract. *Id.* at 639, 381 A.2d 16. In order for the *Testerman* rule to apply, the tortious conduct and the contract must be so intertwined that one cannot be viewed in isolation from the other. *See First National Bank v. Shpritz,* 63 Md.App. 623, 644, 493 A.2d 410 (1985) *cert. denied,* 304 Md. 297, 498 A.2d 1184 (1985); *American Laundry Mach. v. Horan,* 45 Md.App. 97, 112–13, 412 A.2d 407 (1980); Strausberg, *A Roadmap Through Malice, Actual or Implied: Punitive Damages in Torts Arising Out of Contract in Maryland,* 13 U. of Balt.L.Rev. 274, 283 (1984).

In its most recent decision revisiting *Testerman,* the Court of Appeals explained:

> Perhaps the clearest applications of the *Testerman* principle occur when the plaintiff and the tortfeasor are in privity and the conduct of the tortfeasor may properly be pleaded alternatively (whether or not actually pleaded), as a breach of contract and as a tort.

*Miller Building Supply v. Rosen,* 305 Md. 341, 349, 503 A.2d 1344 (1986). In *Miller,* a retailer of appliances sued two of its former salesmen for breach of fiduciary duty, fraud, and civil conspiracy. A jury awarded the retailer both compensatory and punitive damages. The trial judge, however, granted the salesmen's motion for judgment notwithstanding the verdict on punitive damages. We affirmed, *Miller Building Supply v. Rosen,* 61 Md.App. 187, 485 A.2d 1023 (1985), as did the Court of Appeals. The fraud in that case arose when the salesmen violated their duties of loyalty owed to the retailer by virtue of their employment contract. We held that since the tortious conduct arose out of the employer-employee contract and no

actual malice was proven by the retailer, punitive damages were not available. *Id.* at 199, 485 A.2d 1023.

In this Court appellee argues that appellant committed three distinct torts: fraud, battery and negligence. First, with respect to fraud, appellee contends that the situation in the instant case is analogous to the facts in *Wedeman.* She claims that appellant fraudulently induced her to undergo the cataract surgery/intraocular lens implant procedure when it was not necessary. Therefore, like the buyer in *Wedeman,* appellant's representation (that she needed surgery) was the reason appellee entered into the contract. Since this representation was false, she argues, no contractual relationship was created. Secondly, appellee argues that by implanting an intraocular lens without any consent to do so, appellant committed a battery upon her. Thirdly, she maintains that appellant's postoperative care of her eye infection fell below accepted standards of care.

Appellee's complaint which was filed in the circuit court on November 25, 1987 contains no allegations of fraud [4] or battery.[5] Her action was grounded upon two theories of negligence: 1) that appellant performed the surgery on appellee without informed consent, and 2) that appellant failed to comport with the applicable standards of care in appellee's preoperative and postoperative treatment. Furthermore, the trial judge only instructed the jury on the applicable standards for determining negligence *vel non:*

> This case then is simply a claim of negligence by a patient against her doctor and as I indicated to you at the outset of the trial, the words medical malpractice should be of no concern to you and is simply a term often used to de-

---

**4.** Further, appellee failed to produce evidence at trial of the five essential elements of fraud. *See Wedeman, supra,* 278 Md. at 532, n. 5, 366 A.2d 7; *James v. Goldberg,* 256 Md. 520, 528–29, 261 A.2d 753 (1970).

**5.** Maryland follows the "prevailing view that a cause of action under the informed consent doctrine is properly cast as a tort action for negligence, as opposed to battery or assault." *Sard v. Hardy,* 281 Md. 432, 440 n. 4, 379 A.2d 1014 (1977). *See* discussion *infra.*

scribe a negligence action against a health care provider. What we are concerned about is simply whether or not the defendant was negligent in any way with respect to the plaintiff.

Appellee's counsel made no exceptions to the court's instructions. The issues, as framed for the jury and approved by counsel on the special verdict sheet, were couched in terms of whether appellant conformed with the required standards of care in his treatment of appellee. Since the torts of battery and fraud were never asserted below, appellee's arguments related thereto will not be addressed for the first time on appeal. Rule 8–131(a). Thus, our focus in the case *sub judice* is whether the two counts of negligence actually litigated by the appellee arose out of a contractual relationship. We hold that they did.

The relationship between a physician and patient is a consensual one arising out of an express or implied contract. 10 Williston, *Contracts* 3rd ed., § 1286A, p. 946 (1967). Before a physician may be found liable for an act of medical malpractice, it is essential that a patient-physician relationship be in existence at the time the alleged act occurred. Establishment of this relationship must generally be a result of mutual consent. M. McCafferty and S. Meyer, *Medical Malpractice Bases of Liability*, § 1.02 (1985). The general rule is stated in 61 Am.Jur.2d, *Physicians, Surgeons, Etc.*, § 158 (1981):

> A physician is under no obligation to engage in practice or to accept professional employment, but when the professional services of a physician are accepted by another person for the purposes of medical or surgical treatment, the relation of physician and patient is created. The relation is a consensual one wherein the patient knowingly seeks the assistance of a physician and the physician knowingly accepts him as a patient. The relationship between a physician and patient may result from an express or implied contract, either general or special, and the rights and liabilities of the parties thereto are governed by the general law of contract, although the exist-

ence of the relation does not need to rest on any express contract between the physician and the person treated. However, the voluntary acceptance of the physician-patient relationship by the affected parties creates a prima facie presumption of a contractual relationship between them. (Footnotes omitted.)

█ The defective performance of a contractual undertaking may give rise to an action both in tort or in contract. *Bocchini v. Gorn Management Co.,* 69 Md.App. 1, 16, 515 A.2d 1179 (1986). *See also,* Prosser and Keaton, *The Law of Torts,* 5th ed., § 92, p. 663–667 (1984). Recovery for malpractice or professional negligence against a physician is allowed only:

[W]here there is a relationship of doctor and patient as a result of a contract, express or implied, that the doctor will treat the patient with proper professional skill and the patient will pay for such treatment, and there has been a breach of professional duty to the patient.

*Hoover v. Williamson,* 236 Md. 250, 253, 203 A.2d 861 (1964); *See also Dashiell v. Griffith,* 84 Md. 363, 380–81, 35 A. 1094 (1896). While the underlying relationship is contractual, "malpractice is predicated upon the failure to exercise requisite medical skill and, being tortious in nature, general rules of negligence usually apply in determining liability." *Benson v. Mays,* 245 Md. 632, 636, 227 A.2d 220 (1967) (footnote omitted). In *Benson,* the Court of Appeals held that although an action for malpractice can be based on both contract and tort theories, for purposes of venue the suit shall be considered an action *ex delicto* instead of *ex contractu. Id.* at 638, 227 A.2d 220.

Likewise, actions for professional malpractice against an attorney have been held to allege the negligent breach of a contractual duty. *Flaherty v. Weinberg,* 303 Md. 116, 134, 492 A.2d 618 (1985); *Roebuck v. Steuart,* 76 Md.App. 298, 314, 544 A.2d 808 (1988). Such suits may be brought in either contract or tort. *Flaherty, supra,* 303 Md. at 134, 492 A.2d 618; *Mumford v. Staton, Whaley & Price,* 254 Md. 697, 708, 255 A.2d 359 (1969). In *Roebuck, supra,* 76

Md.App. at 314–15, 544 A.2d 808, we unequivocally held, based on *Testerman,* that actual malice was a requirement for the recovery of punitive damages in an attorney malpractice action.

In the instant case, there was an underlying doctor-patient relationship of some ten years standing between the appellee and appellant. Appellee concededly agreed, as her counsel argued to the jury, to "put her future in [appellant's] hands." She contends, however, that since her consent was not informed as to the particular type of cataract operation performed, i.e., the intraocular implant, there was no contract out of which the tort arose, and thus *Testerman* did not apply.

The trial judge agreed and instructed the jury that they could award appellee punitive damages if they found that appellant acted with implied malice. He stated:

> Punitive damages may only be awarded if you find that the defendant was not merely negligent, but acted with malice. That is, he acted so recklessly or outrageously as to indicate a wanton disregard for the rights, health or safety of the plaintiff or with a callous indifference to the consequences.

We disagree.

In the instant case a contractual relationship between the parties arose when appellee accepted appellant's diagnosis that the cataract in her right eye had to be removed. Based on this consensual agreement, certain obligations were created, including appellant's duty to inform appellee of the procedure to be used and the risks involved as well as his duty to treat her properly. *Roebuck v. Steuart, supra,* 76 Md.App. at 325, 544 A.2d 808. *See also Miller v. Kennedy,* 11 Wash.App. 272, 522 P.2d 852, 860 (1974), *aff'd per curiam,* 85 Wash.2d 151, 530 P.2d 334 (1975); *Woods v. Brumlop,* 71 N.M. 221, 377 P.2d 520, 524 (1962).

In *Sard v. Hardy,* 281 Md. 432, 440 n. 4, 379 A.2d 1014 (1977), the Court of Appeals explained the doc-

trine of informed consent recognizing that a claim under that doctrine is a claim of negligence. *See also, Zeller v. Greater Baltimore Med. Center,* 67 Md.App. 75, 84, 506 A.2d 646 (1986). The doctrine of informed consent

> imposes on a physician, before he subjects his patient to medical treatment, the duty to explain the procedure to the patient and to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment. (Citations omitted.)

*Sard, supra,* 281 Md. at 439, 379 A.2d 1014. In the instant case, the jury determined that appellant did not give appellee sufficient information in order to make an intelligent and knowing decision to have the cataract operation. This breach of appellant's duty to inform however, does not vitiate the contractual relationship between the parties. The lack of sufficient information renders the consent ineffectual as a defense to negligence, *id.* at 438 n. 3, 379 A.2d 1014, but does not change the contractual nature of the doctor-patient relationship. Therefore, we hold that appellant's tortious conduct arose out of the preexisting contractual relationship between appellant and appellee. *Wedeman, supra.*

 Next, we must determine if there existed a sufficient nexus between appellant's negligent acts and the contractual relationship out of which they arose. *Piskor, supra.* The instant case is a clear application of this "nexus" principle. Since the parties had a doctor-patient relationship and the tort complained of was the negligent breach of a duty arising from that contractual relationship, this requirement is easily satisfied. "[T]he tort consisted of nothing more than an allegedly negligent performance of contract obligations.... In one form or another, then, the tort arose directly from the performance or breach of the contract." *Piskor, supra,* 281 Md. at 637, 381 A.2d 16.

▇▇▇ Based on their contractual relationship, in order to recover punitive damages for the negligence committed, appellee needed to prove actual malice. *Testerman, supra.* Appellee has not and cannot point to any evidence which established that appellant acted "with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure" appellee. *Testerman, supra,* 275 Md. at 43, 338 A.2d 48. Therefore, the judgment against the appellant for $750,000 in punitive damages must be reversed.

JUDGMENT FOR PUNITIVE DAMAGES REVERSED; COSTS TO BE PAID BY THE APPELLEE.

GILBERT, C.J., concurs.

GILBERT, Chief Judge, concurring.

I concur in the decision of the majority, as expressed by Judge Karwacki. I do so, however, with great reluctance.

What the Court holds today virtually eliminates punitive damages in suits against professionals for malpractice absent a showing of actual malice. This is true because almost all claims grounded in negligence against professionals arise out of a contractual relation, express or implied.

Why negligence arising out of a contract is so sacrosanct that the negligent party is insulated against punitive damages eludes me. Nevertheless, the Court of Appeals, starting with *H & R Block, Inc. v. Testerman,* 275 Md. 36, 338 A.2d 48 (1975), followed by *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 366 A.2d 7 (1976), and then *General Motors Corp. v. Piskor,* 281 Md. 627, 381 A.2d 16 (1977), has articulated that there can be no recovery of punitive damages in tort actions, in the absence of actual malice, if the action arose out of a contract.

So long as *Testerman, Wedeman,* and *Piskor* remain the law of Maryland, this Court, of course, is obligated to adhere to their holdings.

It is, in my opinion, a strange doctrine that precludes recovery of punitive damages for negligence arising out of contract unless actual malice is proven, irrespective of the degree of negligence involved.

*Testerman,* the first of the trilogy of cases to announce the ban on punitive damages in torts arising out of contracts, was decided in 1975. Insofar as we have been able to determine, not one other State has chosen to adopt the reasoning of *Testerman* or its siblings. No other jurisdiction has opted to march to the *Testerman* drum beat, dance to *Wedeman*'s tune, or vocalize *Piskor* lyrics.

Fourteen years have passed since *Testerman* was decided. Perhaps, in light of the fact that its doctrine seems to have been implicitly rejected by the other forty-nine States and the District of Columbia, the Court should reexamine its position.